Karl KNUDSON and Crisan
Singer, Appellants,

v.

CITY OF DECORAH, Appellee.

No. 99–0987.

Supreme Court of Iowa.

Dec. 20, 2000.

Karl G. Knudson, Decorah, for appellants.

Richard D. Zahasky, Decorah, for appellee.

LAVORATO, Chief Justice.

In this proceeding, Karl Knudson and Crisan Singer challenged the City of Decorah's (City) decision to issue tax increment finance bonds pursuant to Iowa Code chapter 403 (1997), Iowa's Urban Renewal Law, for a residential development in an urban renewal area. They did so by filing appeal to the district court pursuant to Iowa Code section 403.9(3) and a declaratory judgment action. The district court sustained the City's motion for summary judgment dismissing both the appeal and declaratory judgment action. Knudson and Singer appeal, raising issues concerning the validity of certain actions the City took under chapter 403. We affirm in part, reverse in part, and remand.

## I. Background.

To understand the issues in this case, we think it would be helpful to discuss several provisions in chapter 403 before proceeding to the facts, procedural history, and merits.

Iowa Code section 403.2 sets out the legislature's declaration of policy. The provision declares that there exist in the municipalities of this state

"slum and blighted areas ... which constitute a serious and growing menace, injurious to the public health, safety, morals and welfare of the residents of the state ... and that the prevention and elimination of slums and blighted areas is a matter of state policy...."

Iowa Code § 403.2(1).

The announced purpose of chapter 403 includes the prevention, elimination, and rehabilitation of "slum and blighted areas" in order that the

"state and its municipalities shall not continue to be endangered by areas which are focal centers of disease, promote juvenile delinquency and consume an excessive proportion of state revenues because of the extra services required for police, fire, accident, hospitalization and other forms of public protection, services, and facilities."

*Id.*

Iowa Code section 403.2(3) declares that there "exists in this state the continuing need for programs to alleviate and prevent conditions of unemployment and a shortage of housing...." Iowa Code § 403.2(3). This provision also recognizes that it is

necessary to provide means and methods ... for the provision of *public improvements related to housing and residential development, and for the construction of housing for low and moderate income families;* that accordingly it is necessary to authorize local governing bodies to designate areas of a municipality as *economic development areas for ... public improvements related to housing and residential development, or construction of housing for low and moderate income families....*

Iowa Code § 403.2(3) (emphasis added).

Several provisions in chapter 403 give municipalities a variety of powers to remedy the problems identified by the Urban Renewal Law and to further its purposes. One such power includes

undertak[ing] and carry[ing] out *urban renewal projects* within its area of operation; and to make and execute contracts and other instruments necessary

or convenient to the exercise of its powers under this chapter; and to disseminate slum clearance and urban renewal information.

Iowa Code § 403.6(1) (emphasis added).

An urban renewal project may include

undertakings and activities of a municipality in an urban renewal area for the elimination and for the prevention of the development or spread of slums and blight, [and] may include the designation and development of an *economic development area* in the urban renewal area....

Iowa Code § 403.17(24) (emphasis added).

An "urban renewal area" is "a slum area, blighted area, *economic development area,* or combination of the areas, which the local governing body designates as appropriate for an urban renewal project." Iowa Code § 403.22 (emphasis added).

An "economic development area" refers to

an area of a municipality designated by the local governing body as appropriate for commercial and industrial enterprises, *public improvements related to housing and residential development, or construction of housing and residential development for low and moderate income families, including single or multifamily housing.*

Iowa Code § 403.17(9) (emphasis added).

An "urban renewal plan" is defined as "a plan for the development, redevelopment, improvement, or rehabilitation of a designated urban renewal area, as it exists from time to time." Iowa Code § 403.23.

To pay for renewal projects, municipalities have the "power to periodically issue bonds in [their] discretion to pay the costs of carrying out the purposes and provisions" of chapter 403. Iowa Code § 403.9(1). Municipalities may use tax money obtained through levies on taxable property in the urban renewal area to (1) pay the principal of and interest on such bonds used to finance in whole or in part

an urban renewal project within the urban renewal area and (2) *provide assistance for low and moderate income family housing.* Iowa Code § 403.19(2).

However, Iowa Code section 403.22(1) (Supp.1997) places a limitation on the use of taxes in this fashion. This provision provides that

> [w]ith respect to any urban renewal area established upon the determination that the area is an *economic development area,* a division of revenue as provided in section 403.19 shall not be allowed for the purpose of providing or aiding in the *provision of public improvements related to housing and residential development, unless the municipality assures that the project will include assistance for low and moderate income family housing.*

Iowa Code § 403.22(1) (emphasis added). This provision goes on to explain the formula for calculating the amount to be provided for low and moderate income (LMI) family housing assistance. *See, id.* The formula essentially requires that a percentage of the *original project cost* be devoted to LMI family housing assistance.

Before a municipality may exercise the powers granted it under chapter 403, its local governing body must adopt a resolution finding that:

1. One or more slum, blighted, or *economic development areas* exist in the municipality.

2. The rehabilitation, conservation, redevelopment, development, or a combination thereof, of the area is necessary in the interest of the public health, safety, or welfare of the residents of the municipality.

Iowa Code § 403.4 (emphasis added).

In addition,

> [a] municipality shall not approve an urban renewal project for an urban renewal area unless the governing body has, by resolution, determined the area to be a slum area, blighted area, *economic development area* or a combina-

tion of those areas, and designated the area as appropriate for an urban renewal project.

Iowa Code § 403.5(1) (emphasis added).

Before a municipality may issue bonds to pay the costs of carrying out the purposes and provisions of chapter 403, it must authorize such action by resolution or ordinance. Iowa Code § 403.9(3). And before instituting proceedings to issue the bonds, the local governing body of the municipality must publish

> notice of the proposed action, including a statement of the amount and purposes of the bonds and the time and place of the meeting at which the local governing body proposes to take action for the issuance of the bonds . . . .

*Id.*

After receiving and considering all objections at such meeting, such body "may take additional action for the issuance of the bonds . . . ." *Id.* However,

> [a]ny resident or property owner of the municipality may appeal the decision of the local governing body to take additional action to the district court of the county in which any part of the municipality is located, within fifteen days after the additional action is taken.

*Id.* Nevertheless, "[t]he additional action of the local governing body is final and conclusive unless the court finds that the municipality exceeded its authority." *Id.*

It is against this background that we now turn to the facts and procedural history of this case.

## II. Facts.

On June 17, 1997, the City designated 200 acres within its corporate limits as a "Hospital Medical and Residential Urban Renewal Area" (Renewal Area), according to a "resolution of necessity." *See* Iowa Code §§ 403.4, .17(22) (1995). The resolution stated that the area had been determined appropriate for designation as an economic development area because, as the

City concedes, the area was "appropriate for public improvements related to housing and residential development."

On July 15 the City passed a resolution approving an "Urban Renewal Plan" (Renewal Plan) concerning the Renewal Area. *See* Iowa Code § 403.17(23) (1997).

On November 4 the City adopted a "Resolution Approving an Urban Renewal Project" (Renewal Project) submitted to it by Aase Haugen Properties, Inc. and Highland Place, Inc., owners of approximately 162 of the 200 acres designated as the Renewal Area. *See* Iowa Code § 403.17(24). The Renewal Project proposed the construction of senior housing and other residential structures and called for tax increment financing.

On April 21, 1998, the City entered into an "Agreement of Redevelopment" (Redevelopment Agreement) with Aase Haugen Properties, Inc. and Highland Place, Inc., pertaining to the development of the Renewal Area. The same day the City adopted a resolution approving the Redevelopment Agreement.

The Redevelopment Agreement called for the construction of public improvements within a portion of the Renewal Area designated as "Phase I." These improvements included "water, sanitary sewer, street, curb and gutter, storm sewer, lighting, regulatory and warning signs, and retaining walls necessary for street construction, including engineering costs associated with such improvements." The agreement provided for tax increment financing for these improvements.

The Phase 1 public improvements were divided into two main parts: Priority 1 and Priority 2. Priority 1 consisted of "[a]ll public improvements East from the quarter section line of the Southwest quarter of the Northeast quarter of Section 9 to existing improvements at or near Locust Road." (This is a distance of 1350 feet and this area is commonly referred to in the record as the "eastern 1350 feet.") Their location is designated on the attached exhibit as "Priority 1." The tax increment financing of these improvements is the subject of one of the issues in this case.

Priority 2 consisted of "public improvements West of the quarter section line of the Southwest quarter of the Northeast quarter of Section 9" and included the following improvements: water, sanitary sewer, street improvements (including grading and curb and gutter, but not including sidewalks or trails), storm sewer, lights, signs, and any other miscellaneous public improvements. The improvements are designated on the attached exhibit as "Priority 2."

According to the Redevelopment Agreement, Aase Haugen Properties, Inc. would provide the City with a minimum assessment agreement that the minimum improvements to its property in the project area would have a value of not less than $5,700,000. The Redevelopment Agreement required the City to use funds from the issuance of tax increment financing bonds (TIF bonds) to pay for Priority 1 improvements and to devote any residual funds from the issuance of these bonds to Priority 2 improvements.

8

The Redevelopment Agreement recognized that,

in computing the amount of incremental revenues available from the project to pay debt service on the bonds, the City is subject to the requirement under the Urban Renewal Act that the City devote not less than 36.35% of the incremental taxes to be used for the provision of housing and residential development to provide assistance for low and moderate income family housing.

On May 19, 1998, the City approved a subdivision plat known as the "Highland Place Subdivision" for the Renewal Area. The plat contained several restrictive covenants, one of which prohibited the placement of "modular or factory built" homes in the subdivision.

Following a public hearing, the City adopted a resolution on July 21 approving a tax-increment financing ordinance. That ordinance provided that the portion of taxes each year in excess of the base-period taxes would be paid into a special tax increment fund to (1) pay the principal of and interest on the bonds issued to finance the Renewal Project and (2) provide assistance for low and moderate income family housing. The City also decided to issue TIF bonds and adopted a resolution instituting proceedings to take additional action to issue those bonds. A week later, following a public hearing, the City adopted a resolution providing for the issuance of TIF bonds to provide a portion of the financing for the Renewal Project.

### III. Proceedings.

On August 5, Knudson and Singer appealed to the district court. Both are residents of the City. Knudson is a property tax payer, and Singer has an income placing her in a low- to moderate-income category within the meaning of Iowa Code section 403.22.

They challenged the legitimacy of the City's action in approving the issuance of TIF bonds to pay for part of the Renewal Project. *See* Iowa Code § 403.9(3). The petition essentially alleged that the City had exceeded its authority in approving issuance of the bonds. The petition also stated a request for declaratory judgment that the City had acted in violation of Iowa Code chapter 403. Later, the petitioners amended their petition, raising several other issues.

Ultimately, the district court sustained the City's motion for summary judgment, rejecting all of the contentions Knudson and Singer raise in their appeal to this court.

### IV. Scope of Review.

We review a grant of a motion for summary judgment for correction of errors at law. *Western States Ins. Co. v. Continental Ins. Co.,* 602 N.W.2d 360, 362 (Iowa 1999). Summary judgment is proper when

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.

Iowa R.Civ.P. 237(c). On review, we examine the record before the district court to decide whether any material fact is in dispute and whether the district court correctly applied the law. *Richardson v. Commodore, Inc.,* 599 N.W.2d 693, 696 (Iowa 1999). In the district court and on review, the evidence must be viewed in the light most favorable to the nonmoving party—in this instance, the appellants. *Id.* The nonmoving party is entitled to every legitimate inference that can be reasonably deduced from the evidence. *Id.*

Additionally, as the City correctly notes, this case involves issues of statutory construction. Such issues raise legal questions and are properly resolvable by summary judgment. *See Krull v. Thermogas Co.,* 522 N.W.2d 607, 610 (Iowa 1994).

### V. Issues.

The appellants raise three main issues on appeal. They first assert the City has failed to comply with the low and moderate income requirements of Iowa Code section 403.22(1) (Supp.1997).

They next assert the City has violated the legislative intent of chapter 403. The appellants argue the violations occurred because the Renewal Project does not result in an increase in "affordable" housing in the Renewal Area and because restric-

tive covenants of the private landowners bar the construction of manufactured housing in the Renewal Project.

The appellants last contend that the City has acted illegally in that the Renewal Project is inconsistent with and violates the City's comprehensive/general growth plan.

## VI. Compliance with Iowa Code Section 403.22(1).

As mentioned, Iowa Code section 403.19(2) permits municipalities to use TIF bonds to finance an urban renewal project within the urban renewal area. But, "[w]ith respect to any urban renewal area established upon the determination that the area is an *economic development area*," tax increment financing "shall not be allowed for the purpose of providing or aiding in the provision of public improvements *related to housing and residential development*, unless the municipality *assures* that the project *will include assistance for low and moderate income family housing*." Iowa Code § 403.22(1) (emphasis added).

**A. The parties' contentions.** The appellants claim that the City intends to use tax increment financing for Priority 1 improvements (the eastern 1350 feet) but considers tax increment financing for such improvements as exempt from LMI requirements. According to the most recent estimates, the City will receive a total of $1,314,552 in incremental taxes over the next fifteen years. Of that amount, $1,182,269 will be used to pay the TIF bonds issued to finance the improvements for the Renewal Project. The remaining $132,284 will be applied to LMI housing assistance over the fifteen-year period. This will result in an LMI housing assistance contribution rate of 10.06% rather than 36.35%, as stated in the Redevelopment Agreement.

Applying the 36.35% rate to the $1,314,552 in incremental taxes produces a product of $477,840 rather than the $132,284 the City is claiming should be

applied to LMI housing assistance. Therefore, the exemption claimed by the City will result in a shortfall of $345,556 for LMI housing assistance.

The City argues that the Redevelopment Agreement and ordinance adopted on July 21, 1998, support its position that 36.35% of the tax increment financing attributable only to the public improvements for Priority 2 improvements would be set aside for LMI housing assistance. The City relies on the language in the Redevelopment Agreement "that the City devote not less than 36.35% of the incremental taxes to be used to provide public improvements *related* to housing and residential development to provide assistance for low and moderate income family housing." (Emphasis added.) The ordinance simply provides that a portion of the incremental taxes will be used "to provide assistance for low and moderate income family housing as provided in section 403.22."

Implicit in this language of the Redevelopment Agreement and of the ordinance is that Priority 1 public improvements are not *related* to housing and residential development, and—for that reason—tax increment financing for those improvements is not to be included in the calculation of LMI housing assistance. This is the position the City takes here. Not surprising, the appellants contend such improvements are so related and therefore must be included in the calculation of LMI housing assistance.

**B. The merits.** The issue narrows down to whether the Priority 1 public improvements are "related to housing and residential development" for purposes of section 403.22(1).

The phrase "related to housing and residential development" as used in section 403.22(1) is not defined. However, "housing and residential development" as that phrase is used in chapter 403 "means single or multifamily dwellings." Iowa Code § 403.17(11). It is undisputed that the construction projects for the Renewal Area

fit the definition of "housing and residential development." The only issue is whether the Priority 1 improvements are *related* to housing and residential development in the Renewal Area for the purposes of section 403.22(1).

Our task then is to construe the phrase "related to." Because chapter 403 does not define the phrase, we look to its common and ordinary meaning. *Gerst v. Marshall,* 549 N.W.2d 810, 814 (Iowa 1996). The term " 'related' is a commonly used word with a broad meaning that encompasses a myriad of relationships." *Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.,* 5 Cal.4th 854, 21 Cal. Rptr.2d 691, 699, 855 P.2d 1263, 1271 (1993). Though it has a broad meaning, "related" is not necessarily an ambiguous word. *Id.* at 1274.

The dictionary defines "related" as "having relationship." Webster's Third New International Dictionary 1916 (unabr. ed.1993). In a legal context, "related" has been defined to mean "standing in relation; connected; allied; akin." *Nowland Realty Co. v. Comm'r of Internal Revenue,* 47 F.2d 1018, 1021 (7th Cir.1931); *accord* Black's Law Dictionary 1288 (6th ed.1990). "Related" has been described as involving both logical and causal connections. *See Bay Cities Paving,* 21 Cal.Rptr.2d 691, 702, 855 P.2d at 1274. The similar phrase "relate to" carries a like meaning: "[t]o stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with. . . ." Black's Law Dictionary 1288.

The appellants assert that the eastern 1350 feet of infrastructure improvements, *i.e.,* Priority 1, which include a street, would provide the only public access and sewer/water service into the interior 162 acres of the Renewal Area. They claim that, without these improvements, the interior land cannot be developed for housing and residential purposes.

In response, the City contends that the Priority 1 improvements are not related to housing and residential development be-cause those improvements will not actually be in or be a part of any housing or residential development. Implicit in the City's argument is that, for public improvements to be related to housing and residential development, the improvements must be in or part of the housing and residential development in question.

However, there is nothing in chapter 403 that supports the City's argument. Rather, section 403.22(1) merely requires that public improvements be *related to* housing and residential development. Here, the Priority 1 improvements lead directly into and connect directly with the housing and residential development in the Renewal Area. Though the Priority 1 improvements are not actually in or part of any residential development in the Renewal Area, those improvements appear to provide the only link between the Renewal Area and surrounding areas. For example, the street contemplated by the Priority 1 improvements will provide the main, if not the only, route of access to and from the housing and residential communities in the interior portion of the Renewal Area. As the appellants point out, without this improvement, the development of the interior land could not occur.

The City suggests that the street in the Priority 1 area may be part of a future street plan that will serve more than the Renewal Area. Nevertheless, we cannot ignore that this street will continue to provide significant service to the Renewal Area. Simply because public improvements might relate to *more* than just housing and residential development does not mean that those improvements do not relate to housing and residential development. Additionally, section 403.22(1) contains no language that mandates its requirements apply only if the public improvements relate to housing and residential development and nothing else. Moreover, as things are now planned, the Priority 1 improvements remain primarily connected to the Renewal Area. This fact should not be negated by

the possibility that sometime in the future those improvements may become part of a greater development project.

We conclude that as a matter of law the Priority 1 public improvements are related to the housing and residential development in the Renewal Area because such improvements have a *reasonable nexus or logical connection* with the development. *See Showalter v. Rinard,* 126 B.R. 596, 599 (D.Or.1991) (holding that, in the context of bankruptcy, a civil proceeding is related to a bankruptcy case for purposes of establishing district court jurisdiction "if there is a reasonable nexus or logical connection between the two"). Therefore, the City was statutorily required pursuant to section 403.22(1) to give adequate assurances that those improvements will be included in calculating the amount of money to be provided for assistance for low and moderate income family housing. It is undisputed that the City has not given such assurances. The district court erred in concluding the City has given adequate assurances as required by law and in granting summary judgment on this issue.

The district court also concluded section 403.22(1) does not mandate that tax increment funds from the TIF bonds diverted for LMI housing assistance must be spent in the Renewal Project. Rather, such funds may be spent at various locations within the City. The appellants did not dispute this in district court, nor do they dispute it here. We likewise agree with the district court.

■ **C. City's remaining argument.** On August 22, 1997, the City's administrator sent a "Pre Application" letter to the Iowa Department of Economic Development (IDED), stating that the LMI percentage should be reduced and asking for a variance. *See* Iowa Code § 403.22(1) (giving IDED authority to vary the LMI percentage "if the municipality can show that it cannot undertake the project if it has to meet the [LMI] assistance requirements"). According to the administrator, IDED told him that, if IDED received confirmation from the City's bond counsel that the requirements of section 403.22(1) do not apply to the Priority 1 improvements, there would be no LMI obligation for such improvements.

The City withdrew its request for the variance and later voted to issue the TIF bonds. Three days later the City's bond counsel wrote IDED informing it that counsel believed the requirements of section 403.22(1) did not apply because the Priority 1 improvements were not directly related to the housing and residential development in the Renewal Area. Such improvements were not so related, counsel wrote, because the improvements were not actually a part of the housing and residential development.

The City contends that, when it withdrew its request for variance, it relied on IDED's interpretation of the LMI requirements and the written opinion from the City's bond counsel, with which IDED agreed. For reasons that follow, we conclude the City's reliance was misplaced.

There is nothing in chapter 403 that gives IDED the power to determine whether the requirements of Iowa Code section 403.22(1) apply. Rather, section 403.22(1) gives IDED the authority to set a different LMI percentage as "set out in a plan adopted by the municipality and approved by [IDED] *if the municipality can show that it cannot undertake the project if it has to meet the low and moderate income family assistance requirements.*" Iowa Code § 403 .22(1). Pursuant to this authority, the Iowa Administrative Code gives IDED the responsibility to rule on requests for variances from the LMI housing assistance requirements of section 403.22(1). *See* Iowa Admin. Code r. 261—26.1 (1998). This rule does not give IDED authority to determine whether the LMI requirements of section 403.22(1) apply. Rather, the rule merely gives IDED the authority to determine when it may exempt a municipality from the statute's requirements to which the municipality

would otherwise be subject. *See generally* Iowa Admin. Code ch. 261—26.

The City's bond counsel's opinion adds nothing to IDED's authority. The opinion was simply that—just an opinion, which could be right or wrong.

It is undisputed that the City neither complied with the requirements of section 403.22(1) nor with the administrative rules regarding a request for a variance. Without such a variance, we hold as a matter of law the City was not exempt from the LMI requirements regarding the Priority 1 improvements. The district court erred in concluding otherwise and in granting summary judgment on this issue.

### VII. Whether the Renewal Project Complies with the Legislative Intent of Iowa Code Chapter 403.

The appellants also assert that the Renewal Project is in violation of the legislative intent underlying chapter 403 that tax increment financing of public improvements related to housing and residential development should (1) result in affordable housing and (2) not exclude manufactured housing.

**A. Whether the Renewal Project must result in affordable housing.** The appellants assert that we should interpret chapter 403 to require that, when revenues from the issuance of TIF bonds are used to finance public improvements related to housing and residential development, the development should result in an increase in "affordable" housing in the project area. The appellants argue this is necessary to make the provisions of chapter 403 consistent with the public purpose requirement of article III, section 31 of the Iowa Constitution (requiring that "no public money or property shall be appropriated for local, or private purposes . . . .").

As mentioned, the appellants concede that LMI funds generated by the issuance of TIF bonds can be used anywhere within the City to provide housing

assistance. However, they argue that there is still a requirement that the "development must meet a need by providing affordable housing in the project area to those who would not otherwise be able to afford decent, safe, and sanitary housing."

The Renewal Project here hinged on the designation of the area in question as an "economic development area." This was based on the finding that the area was "appropriate for public improvements related to housing and residential development." *See* Iowa Code § 403.2(3).

The term "housing and residential development" as used in chapter 403

> means single or multifamily dwellings to be constructed in an area with respect to which the local governing body of the municipality determines that there is an inadequate supply of affordable, decent, safe, and sanitary housing and that providing such housing is important to meeting any or all of the following objectives: retaining existing industrial or commercial enterprises; attracting and encouraging the location of new industrial or commercial enterprises; *meeting the needs of special elements of the population, such as the elderly or persons with disabilities; and providing housing for various income levels of the population which may not be adequately served.*

Iowa Code § 403.17(11) (emphasis added).

When read together, Iowa Code sections 403.2(3) and .17(11) suggest that, when an economic development area is designated as appropriate for housing and residential development, this means the area is appropriate for the construction of single and multifamily dwellings in that area. The facts necessary for such a designation are two: (1) there is a shortage of affordable, decent, safe and sanitary housing in the economic development area and (2) providing such housing in the economic development area is important to meeting a variety of goals.

■ Therefore, unless affordable housing is constructed in the economic development area, then the purpose of designating the area as an economic development area would not be met. Any public financing of a residential development in an economic development area that does not provide affordable housing would result in the use of public money for private purposes because the public purposes of chapter 403 would not be met.

Chapter 403 is silent on what constitutes affordable housing. Appellants suggest that affordable housing should be defined as the type of housing that is available to "persons ... not ... so poor as to fit into the LMI category, but ... not ... so wealthy that they are capable of meeting their housing needs independently without urban renewal." They assert our decision in *John R. Grubb, Inc. v. Iowa Housing Finance Authority*, 255 N.W.2d 89 (Iowa 1977), supports their interpretation of Iowa Code section 203.17(11). Their reliance on *Grubb* is misplaced. There we were concerned with the powers of the Iowa Housing Finance Authority under Iowa Code chapter 220 (now Iowa Code chapter 16). Language in that case upon which appellants seek to rely is not applicable because our discussion was based primarily on specific statutory language that is not applicable to the present case.

What appellants are really seeking is an objective definition of "affordable." Iowa Code section 403.17(11) does not support the type of objective definition that appellants argue should apply. Section 403.17(11) does not require that such "affordable" housing be available to "persons ... not ... so poor as to fit into the LMI category, but ... not ... so wealthy that they are capable of meeting their housing needs independently without urban renewal." Rather, "affordable" housing need only be the type of housing that is important to, for example, "meeting the needs of special elements of the population, such as the elderly or persons with disabilities" or "providing housing for various income lev-

els of the population which may not be adequately served." Where housing would meet these needs, it cannot be said not to be "affordable."

Additional support for this interpretation is found in Iowa Code section 403.2(3), wherein the public purpose for the designation of economic development areas stems from "the continuing need for programs to alleviate and prevent conditions of unemployment and a shortage of housing...." Iowa Code § 403.2(3). The public purpose as it relates to the designation of economic development areas is not strictly for the need to eliminate a shortage of lower income housing as is implied by the definition of "affordable" housing proffered by the appellants. Rather, because the legislature did not limit the scope of section 403.2(3) it appears the legislature was interested in alleviating and preventing housing shortages in all income ranges. Nothing in article 3, section 31 of the Iowa Constitution states that the public purpose requirement can only be satisfied where a project or expenditure benefits only lower income persons or those persons specifically identified by the appellants; and this court has previously said that "[a] law may serve the public interest although it benefits certain individuals or classes more than others." *Grubb*, 255 N.W.2d at 95. Furthermore, that a public purpose is served even where certain individuals or classes are benefited more than others is not negated, even if we assume (without deciding) that the legislature intended the provisions of section 403.2(3) or section 403.17(11) to primarily benefit lower income persons or those persons identified by the appellants. *See Gravert v. Nebergall*, 539 N.W.2d 184, 188 (Iowa 1995).

■ Here, the appellants produced evidence, which the City does not dispute, showing that the cost of residential development and senior housing to be built in the project area can only be afforded by those with medium to high levels of income. However, appellants have made no

showing that such housing will not assist in meeting the objectives outlined in Iowa Code section 403.17(11). Appellants have made no showing that the housing at issue here will not be affordable by those for whom the City has determined such housing is needed—for example, the elderly or certain income levels of its population. Absent any showing to this effect, it cannot be said the City has acted contrary to the provisions of the Urban Renewal Law or the act's stated public purpose, or that the City has acted in violation of the public purpose requirement of article III, section 31 of the Iowa Constitution.

In granting summary judgment for the City on this issue, the district court ruled that "[i]t is well within the definition of public purpose for a municipality to attempt to stop the flow of its residents to surrounding suburbs and countryside." While we make no ruling with respect to the propriety of the district court's logic or rationale, we nevertheless affirm the district court's ruling. *See Grefe & Sidney v. Watters*, 525 N.W.2d 821, 826 (Iowa 1994) (holding this court will affirm the judgment of a district court on any proper basis appearing in the record, even though it is not one upon which the district court based its holding).

**B. Whether the City has improperly excluded manufactured housing.** The Iowa Code provides that

> [a] municipality shall not prohibit or restrict the construction of manufactured homes in any project for which public improvements were finalized under this section. As used in this subsection, *"manufactured home"* means the same as under section 435.1, subsection 2.

Iowa Code § 403.22(6) (Supp.1997). Iowa Code section 435.1(2) provides that a manufactured home "is a factory-built structure built under the authority of 42 U.S.C. § 5403...." Iowa Code § 435.1(2) (1997).

On May 19, 1998, the City approved an addendum to the Renewal Project subdivision plat and restrictive covenants by the developers, Aase Haugen Properties, Inc. and Highland Place, Inc. One restrictive covenant provided that "[n]o modular or *factory-built* home may be placed in the addition." (Emphasis added.)

The appellants contend that, in approving the restrictive covenant, the City prohibited or restricted the construction of manufactured homes in the Renewal Project. The City responds that it merely approved the subdivision plat and restrictive covenants and that it did not itself take action prohibiting or restricting the construction of manufactured homes in the project. The City argues that the covenants were contractual in nature and were between private landowners.

We agree with the appellants that the legislative intent of section 403.22(6) was to prohibit tax increment financing of any public improvements in a development that excludes manufactured housing. We hold as a matter of law that, by its approval of the plat, the City violated section 403.22(6).

We conclude the district court erred in granting summary judgment on this issue.

## VIII. Whether the Renewal Project Conforms to the City's General Plan.

The appellants' last contention is that the Renewal Project does not conform to the City's general plan and, therefore, violates Iowa Code sections 403.5(4)(b) and .17(23). In support of their contention, the appellants argue that the Renewal Project violates the City's plan because the project (1) contains a street ending in a cul-de-sac that is approximately 4000 feet long and (2) violates the plan's prohibition against "leapfrog development."

**A. Background.** An urban renewal plan must "[c]onform to the general plan for the municipality as a whole...." Iowa Code § 403.17(23); *see also* Iowa Code § 403.5(4)(b) (providing that a municipality may approve an urban renewal plan if it finds that the "plan conforms to

the general plan of the municipality as a whole"). Chapter 403 does not define "general plan." However, the City does not dispute that its "Comprehensive Development Plan" is its "general plan."

Not only must an urban renewal plan be consistent with the general plan, but an urban renewal project must be consistent with the urban renewal plan. *See* Iowa Code § 403.17(24) (providing that an urban renewal project "may include undertakings and activities of a municipality in an urban renewal area . . . in accordance with an urban renewal program"). Therefore, as the appellants contend, both the City's Renewal Plan and Renewal Project must be in conformity with the general plan, *i.e.,* the City's comprehensive development plan.

**B. Cul-de-sac requirements.** The City's general plan states that "cul-de-sac streets . . . shall not be longer than six hundred feet. . . ." This requirement is found in the plan's section regarding zoning and subdivision ordinances. The plan's section on policies regarding local streets similarly provides that "[c]ul-de-sac streets generally should be short, not over 600 feet in length. . . ."

Here, the Renewal Project calls for the construction of a cul-de-sac street extending almost 4000 feet. The Renewal Project therefore does not conform to the City's general plan.

The City does not dispute this. Rather, the City contends that the cul-de-sac street is part of a future plan to build a "collector" street through the Renewal Area. The City further contends that this cul-de-sac street will some time in the future connect to other streets, making a "through" street that would not be in violation of the 600 foot cul-de-sac limit.

However true this may be, the Renewal Project calls for the construction of a cul-de-sac street whose length is in violation of the City's general plan. Additionally, the record evidence indicates that the cul-de-sac may be surrounded by housing development, possibly precluding the extension of a "through street" anywhere off the cul-de-sac.

For all these reasons, we conclude as a matter of law the cul-de-sac is in violation of the City's general plan. Our conclusion necessarily means the Renewal Plan and Renewal Project do not conform with the City's general plan as required by law.

We conclude the district court erred in granting summary judgment on this issue.

**C. "Leapfrog" development.** The policy section of the City's general plan provides that

> [t]o accommodate . . . growth and to provide for economical extension of utilities, streets, and other municipal services, and to *minimize leapfrog development,* urban growth should occur as infill and extend outward from developed areas.

We view "leapfrog" development as referring to new development that does not extend outward in a uniform and continuous fashion from existing developments.

We think the "leapfrog" development provision is simply a stated *goal* in the City's general plan. By this we mean that the plan simply discourages leapfrog development but does not prohibit it. Unlike the cul-de-sac requirements, the leapfrog language does not appear in the City's zoning or subdivision ordinances. The plan therefore does not require the City to prohibit leapfrog development.

We conclude the district court correctly granted summary judgment on this issue.

## IX. Disposition.

In sum, we reach the following conclusions. The Priority 1 improvements are related to the housing and residential development in the Renewal Area. For this reason, the City was required to give assurances pursuant to Iowa Code section 403.22 that those improvements would be included in calculating the amount of money for assistance for low and moderate

income family housing. The City failed to give such assurance. The district court erred in concluding otherwise and in granting summary judgment on this issue.

Though we rely on different grounds than those of the district court, we conclude the district court did not err in granting summary judgment on appellants' argument that residential development in the Renewal Area will not be affordable, and therefore violates the legislative intent and purpose of Chapter 403 and the public purpose requirements of article III, section 31 of the Iowa Constitution.

The City improperly excluded manufactured housing in the Renewal Project and violated the City's general plan by approving the construction of a cul-de-sac street extending almost 4000 feet in the Renewal Project. The district court erred in concluding otherwise and in granting summary judgment on this issue.

The district court did not err in granting summary judgment as to the appellants' contention that the Renewal Project violates the City's general plan relating to leapfrog development.

Accordingly, we affirm in part, reverse in part, and remand for further proceedings.

We have considered all of the parties' contentions. Those we have not addressed either lack merit or were not preserved for our review.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**