# IN THE SUPREME COURT OF IOWA

No. 14–1362

Filed April 22, 2016

Amended June 24, 2016

**CONCERNED CITIZENS OF SOUTHEAST POLK SCHOOL DISTRICT,**

Appellant,

**SOUTHEAST POLK COMMUNITY SCHOOL DISTRICT BOARD OF EDUCATION,**
Intervenor-Appellant,

vs.

**CITY OF PLEASANT HILL, IOWA,** and the **CITY COUNCIL OF THE CITY OF PLEASANT HILL, IOWA,**

Appellees.

_____

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Eliza Ovrom, Judge.

A citizens group and a school district seek further review of a court of appeals decision affirming a district court ruling that a municipality acted lawfully in amending an economic development urban renewal plan. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Gary D. Dickey of Dickey & Campbell Law Firm, P.L.C., Des Moines, for appellant Concerned Citizens of Southeast Polk School District.

John E. Lande and Thomas D. Hanson of Dickinson, Mackaman, Tyler & Hagen, P.C., Des Moines, for appellant Southeast Polk Community School District Board of Education.

William J. Miller of Dorsey & Whitney LLP, Des Moines, and R. Bradley Skinner of Skinner Law Office, P.C., Altoona, for appellees.

**MANSFIELD, Justice.**

This case presents important issues relating to the use of tax increment financing (TIF) for economic development purposes. A citizens group and a school district have challenged a city's urban renewal plan. They claim the plan violates Iowa law because it (1) unlawfully extends the duration of a TIF area, (2) unlawfully uses revenue from that TIF area to support development in other parts of the city, and (3) fails to conform to the terms of the city's general plan.

Both the district court and the court of appeals rejected these challenges. On further review, we conclude that extending the duration of the TIF area was impermissible because that area had previously been consolidated with other TIF areas and therefore no longer existed. Thus, the old TIF area could not benefit from a grandfather provision in a 1994 Iowa law that otherwise limited such TIF arrangements to twenty years' duration. We further hold that revenue may be shared within the consolidated, larger TIF area, subject to the time limits set forth in the 1994 Iowa law. Lastly, we agree that the urban renewal plan and the city's general plan were not inconsistent with each other. For these reasons, we vacate the court of appeals decision, affirm the district court judgment in part, reverse in part, and remand for further proceedings.

## I. Background Facts and Proceedings.

Iowa Code chapter 403 covers urban renewal in Iowa. Under that chapter, the governing body of the municipality must first determine by resolution that an area is "a slum area, blighted area, economic development area or a combination of those areas." Iowa Code §§ 403.5(1), .17(23) (2013). This area, having been designated as appropriate for a renewal project, is known as an urban renewal area (URA). *Id.* The municipality also must prepare or cause to be prepared

an urban renewal plan that lays out proposed projects for "the development, redevelopment, improvement, or rehabilitation" of the designated URA. *Id.* §§ 403.5(2)(*a*), .17(24).

The governing body submits the urban renewal plan to the municipality's planning commission for review and recommendation as to whether it complies with the general plan of development for the municipality. *Id.* § 403.5(2)(*a*). The governing body then holds a public hearing on the plan. *Id.* § 403.5(3). After the hearing, the governing body may approve the plan. *Id.* § 403.5(4). The plan may be modified at any time, subject to the hearing process if the modification will require an increase in debt service or other issuance of indebtedness. *Id.* § 403.5(5).

Chapter 403 also authorizes a unique form of financing for urban renewal projects. This is known as tax increment financing (TIF). *Id.* § 403.19. TIF works on the theory that any projects completed in the URA will increase the taxable value of the properties included within the area. Upon approval of a TIF district, the assessed value of the properties within the district is frozen for purposes of normal tax assessment by the municipality. *Id.* § 403.19(1)(*a*). Then, the tax collected for any enhanced value above this base is allocated to a separate fund designated to pay for any indebtedness incurred to complete the improvements. *Id.* Presumably, that is because the improvements bring about the increased property value. "In theory, the process is a closed circuit: the incremental revenues pay for the public expenditures, which induce the private investment, which generates the incremental revenues, which pay for the public expenditures." Richard Briffault, *The Most Popular Tool: Tax Increment Financing and the Political*

*Economy of Local Government*, 77 U. Chi. L. Rev. 65, 68 (2010) [hereinafter Briffault].

After the project debt has been paid through the allocation of TIF revenues, any increased tax revenue thereafter goes to the normal taxing districts. Iowa Code § 403.19(2)(*c*). By its nature, TIF diverts property tax revenue that would otherwise be available to the regular taxing districts. *See* Briffault, 77 U. Chi. L. Rev. at 88 ("From a municipal perspective, TIF is far better than either tax abatement authority or revenue-enhancement authority because it permits the capture and use for municipal economic development projects of revenues that would have gone to these other governments."). Potentially, TIF can lead to controversy because a city or town's use of TIF results in less money going to the county and the school district in that area. *See* Brad Perri, Note, *Financing the Future: Interpreting the "Economic Development Area" Provision of the Iowa TIF Statute*, 50 Drake L. Rev. 159, 161 (2001); *see also* Briffault, 77 U. Chi. L. Rev. at 88–90.

Until 1994, TIF arrangements were not subject to any time limit. In that year, the legislature amended the law, limiting TIF revenue division for economic development areas, but not slum or blighted areas, to twenty years. 1994 Iowa Acts ch. 1182, § 8 (codified as amended at Iowa Code § 403.17(10)).[1] Yet the same amendment altered the wording

---

[1]Throughout this opinion, we will use the shorthand "twenty years" or "the twentieth year." We recognize our terminology is not strictly accurate. The relevant language is

> twenty years from the calendar year following the calendar year in which the municipality first certifies to the county auditor the amount of any loans, advances, indebtedness, or bonds which qualify for payment from the division of revenue provided in section 403.19.

Iowa Code § 403.17(10). References to twenty years or the twentieth year in this opinion should be understood as referring to the longer, more precise statutory language.

of the TIF law to allow the tax valuation freeze to be used through the entire URA rather than only within the portion of the URA where the project was being constructed. *Id.* § 10 (codified as amended at Iowa Code § 403.19(2)(*a*)); *cf. Richards v. City of Muscatine,* 237 N.W.2d 48, 61 (Iowa 1975) (holding that under prior law the statute "can be applied to freeze the tax valuation only in areas being physically redeveloped by an urban renewal project"). Thus, the municipality could now freeze valuation for an entire urban renewal area rather than just the project area, but such valuation freeze was limited to twenty years in economic development areas.

The twenty-year limitation applied to "urban renewal plans approved . . . on or after January 1, 1995." 1994 Iowa Acts ch. 1182, § 15. On June 28, 1994, the Pleasant Hill City Council adopted resolutions establishing Urban Renewal Area No. 1 (the "Copper Creek URA") and an urban renewal plan ("Plan") for the Copper Creek URA. The Plan envisioned that a golf course and single- and multi-family housing would be constructed in the northwest corner of the City. The Plan provided it would remain in effect for twenty years and for any additional time while "obligations payable from incremental taxes are outstanding." The Plan also stated,

> This Urban Renewal Plan may be amended to include such things as a change in the project boundaries, to modify renewal objectives or activities, to add or change regulations for development of property, or for any other purposes consistent with Chapter 403 of the Code of Iowa, following a public hearing on the proposed change, in accordance with Chapter 403 of the Code of Iowa.

That same day, the Pleasant Hill City Council also passed an ordinance for TIF purposes. This ordinance permitted the division of property taxes within the Copper Creek URA, in accordance with Iowa

Code section 403.19, "to finance or refinance in whole or in part projects in the [Copper Creek URA]." It does not appear the ordinance has been amended since its original passage.

In 1995, the City created a second URA to the east of the Copper Creek URA known as the Industrial URA. As before, the City simultaneously took steps to make this URA a TIF district. And in 2000, the City created yet another URA with a TIF division of property tax revenue. This URA was also to the east of the original Copper Creek URA and was known as the East URA.

In 2006, the City consolidated the Industrial and East URAs into the Copper Creek URA, which by then had been renamed the Pleasant Hill URA. The Plan was amended to cover the consolidation. In addition, some property that had not previously been covered by any of the three URAs was added to the Pleasant Hill URA. The resolution amending the Plan explained,

> Changing economic needs and priorities now make it unnecessary to maintain each of the [URAs] as a separate area, and the City has determined that consolidation of the [URAs] would enable the City to maximize the benefits of further development within the City and make it possible to devote increment property tax revenues in a more efficient manner.

The resolution added, however, "[T]he adoption of this Amendment will have no effect on any of the tax increment ordinances or amendments that have been adopted for any of the [URAs] . . . ." The Pleasant Hill URA, like its predecessors, was an economic development area, not a slum or blighted area.

In June 2013, the City annexed 238 acres on the east edge of town across Highway 163 from Southeast Polk High School.[2] By resolution, the City also established a new economic development area consisting of the newly annexed property, plus certain existing street rights-of-way that were already located within the City. Additionally, the City amended the Plan to incorporate the just-created URA into the existing Pleasant Hill URA (the Amended Plan).

The Amended Plan provided for certain projects to be completed on the newly added streets and the newly annexed property. These projects included both improvements to existing streets and construction of new streets. The Amended Plan also stated that "[i]ncremental property tax rebate payments to a developer are authorized with respect to the development of property that is being annexed to the City." In addition, the Amended Plan purported to extend the life of the *original* Copper Creek URA for twenty more years.[3]

The City's intention was to use TIF revenue from the old Copper Creek URA to subsidize the street improvements and other infrastructure in the newly added areas of the larger Pleasant Hill URA.[4] Moreover, the approving resolution referred to "the possible use of future [TIF] revenues

---

[2]This property is located a few miles east of the earlier URAs.

[3]Paperwork prepared by the City—as well as the testimony of its bond counsel—acknowledged that the Copper Creek URA was the only area established prior to July 1, 1994, and thus the only area where the City could extend the URA and the TIF arrangement beyond twenty years.

[4]A memo from the city manager to the mayor and city council noted,

The Copper Creek URA is the only area that was established prior to a change in the State law limiting URAs to 20 years, and therefore is the only area the city can extend the life of, for 20 years. This area generates the greatest amount of TIF revenue of all the URA areas. The other [Plan] amendments will allow the City to make public improvements [using TIF money] in areas that need work either due to age or for development.

in the form of a rebate agreement to a private developer." Additionally, although the Plan amendment did not so state, the City was actively working with a private company toward the development of one million square feet of warehouse space on the annexed land. For example, the City had already sought a grant from the Iowa Department of Transportation to help cover the costs of street construction and improvements, representing that the funds were needed "to handle the projected truck traffic for the future development of a light industrial area of approximately 71 acres."

On July 22, 2013, the Concerned Citizens of Southeast Polk School District (Concerned Citizens), a nonprofit entity comprised of residents of the Southeast Polk School District,[5] filed a petition for a writ of certiorari and for a declaratory judgment and an injunction to prevent both the annexation and the Amended Plan from taking effect.[6] Concerned Citizens alleged that the City's proposals would reduce available property tax revenue while increasing truck traffic in the vicinity of Southeast Polk High School. Initially, the City filed a motion to dismiss, which the district court denied after a hearing. Subsequently, on May 2, 2014, the City filed a motion for summary judgment. While the City's summary judgment motion was pending, the district court permitted the Southeast Polk Community School District Board of Education (the District) to intervene as an additional plaintiff.[7]

---

[5]This district covers Pleasant Hill, part of Altoona, and several unincorporated areas.

[6]The annexation was upheld by the district court and became the subject of a separate appeal to this court. We dismissed that appeal for lack of jurisdiction. *Concerned Citizens of Se. Polk Sch. Dist. v. City Dev. Bd.*, 872 N.W.2d 399, 402, 405 (Iowa 2015).

[7]In its motion to intervene and its petition, the District raised concerns about the ongoing diversion of property tax revenue that would otherwise flow to the District.

A summary judgment hearing was held on June 11. At that time, three legal challenges to the Amended Plan remained. First, Concerned Citizens and the District alleged that the 2013 resolution illegally extended the Copper Creek URA for an additional twenty years. Second, the District maintained that the 2013 resolution unlawfully allowed TIF funds from the original Copper Creek URA to support projects outside that URA. Third, Concerned Citizens alleged the resolution failed to conform with the City's Comprehensive Development Plan.

The district court granted the City summary judgment on the first issue. It reasoned that because the Copper Creek URA was established before January 1, 1995, it was not subject to the twenty-year statutory sunset in Iowa Code section 403.17(10). The court also rejected the plaintiffs' contention that the post-January 1, 1995 consolidation of URAs and the amendment and expansion of the Plan meant the City no longer could rely on the grandfathered status of the pre-January 1, 1995 Copper Creek URA:

> Given the liberal construction to be accorded to Chapter 403, and the discretion vested in cities to carry out the urban renewal law, the court concludes that the Copper Creek URA is not subject to the 20-year time limit in Section 403.17(10), and the other URAs created after that date are subject to the 20-year limitation.

The district court also granted summary judgment to the City on the question whether TIF revenues from the original Copper Creek URA could be used outside that URA. The court found our decision in *Fults v. City of Coralville,* 666 N.W.2d 548, 553–54 (Iowa 2003), dispositive. There we held that two URAs could be combined into a new URA so that TIF revenues could be shared across the original URA lines. *Id.*

Lastly, finding genuine issues of material fact, the court denied summary judgment on the third issue, i.e., whether the June 2013

resolution conformed with the City's Comprehensive Development Plan. However, after conducting a trial the following month, the court found that the City had not violated its own Comprehensive Development Plan. The court drew broadly on our decision in *McMurray v. City Council of the City of West Des Moines*, 642 N.W.2d 273, 282 (Iowa 2002). In doing so, the court compared "the officially stated components of the urban renewal plan amendment,"—not the potential future development on the land—to the City's general plan. *See id.*

Both Concerned Citizens and the District appealed. The court of appeals affirmed, generally agreeing with the district court's analysis. We granted further review.

## II. Standard of Review.

"We review a grant of a motion for summary judgment for correction of errors at law." *Id.* at 276. Issues of statutory construction are legal questions and "are properly resolvable by summary judgment." *Knudson v. City of Decorah*, 622 N.W.2d 42, 48 (Iowa 2000). We agree with the court of appeals that the portion of the case not resolved on summary judgment was tried at law and therefore review the district court's determination of the general-plan issue for correction of errors at law. *Oberbillig v. W. Grand Towers Condo. Ass'n*, 807 N.W.2d 143, 149 (Iowa 2011). In undertaking this aspect of our review, we are bound by well-supported findings of fact. *Id.*

## III. Analysis.

**A. The Copper Creek URA Extension.** The City's 2013 resolution brought about two significant changes. First, it purported to add twenty years' duration to the original Copper Creek URA that was within the Pleasant Hill URA and thus extend the TIF arrangement in the Copper Creek URA for twenty years. Second, it added newly-annexed

territory north of Southeast Polk High School and some existing city street rights-of-way to the Pleasant Hill URA with the intent of using Copper Creek URA TIF revenue in those areas. We will begin by addressing the legality of the Copper Creek URA extension.

Iowa Code section 403.17(10) limits a TIF division based upon an economic development determination to twenty years. However, when this provision was added in 1994, the enabling act stated that it "applies to urban renewal plans approved . . . on or after January 1, 1995." 1994 Iowa Acts ch. 1182, § 15. Concerned Citizens and the District argue that the use of the word "plans" is significant. In their view, once a plan was amended—and particularly when the amendment involved the consolidation of various URAs—any grandfathering ended and the original twenty-year limit took over.

The City, on the other hand, notes that the 1994 legislation only required that the plan have been "approved" before January 1, 1995. Section 403.5 expressly permits the modification of plans after they have been approved and did so even before the twenty-year time limit was enacted. *See* Iowa Code § 403.5(5)(*a*); 1994 Iowa Acts ch. 1182, § 6. Thus, for purposes of the twenty-year time limit, the City contends that the pre-amendment existence of the Plan is what matters: The Plan can later be amended without affecting the grandfathered status of any URA utilizing a TIF arrangement that was established before 1995.

At oral argument, the City took an even more assertive stance. Its attorney said the City could amend a plan to subject more territory to a TIF arrangement and thereby avoid the twenty-year limit within *any* of the territory, so long as the original plan had been approved before 1995. However, in its briefing, the City concedes it "would violate the law" if the TIF allocation were extended beyond the twenty-year limit in any part of

the Pleasant Hill URA *other than* the original Copper Creek URA.  This is what the district court found.

Notably, the relevant language of section 403.17(10) refers to both the URA and the plan.  It states,

> If an urban renewal plan for an urban renewal area is based upon a finding that the area is an economic development area and that no part contains slum or blighted conditions, then the division of revenue provided in section 403.19 and stated in the plan shall be limited to twenty years . . . .

Iowa Code § 403.17(10).  Thus, the City's concession in its briefing is logical.  If the sunset is tied to an area, as it clearly is, it is reasonable that the grandfathering exception would also be tied to an area—in this case the metes and bounds of the URA approved before 1995.[8]

As the district court put it, "[A]n urban renewal plan cannot exist without an urban renewal area.  By definition, an urban renewal plan is a plan for the development 'of a designated urban renewal area, as it exists from time to time.' " (Quoting Iowa Code § 403.17(24).).

By contrast, the oral argument position taken by the City would have allowed a municipality to have an evergreen TIF for economic development purposes throughout its boundaries, merely because it approved a small-scale economic development TIF before January 1,

---

[8]The Legislative Services Agency interprets the grandfather provision as based on the area,

> Until 1994, no limits were placed on the length of time an urban renewal area could be in existence.  That is still the case for urban renewal areas created based on a finding that an area is a slum or blighted area.  In 1994, the law was amended to provide that economic development urban renewal areas are limited in duration to 20 years from the year that revenue is first divided . . . .

Susan Crowley & Michael Duster, Legislative Servs. Agency, *Legislative Guide: Urban Renewal and Tax Increment Financing* 4 (2012), www.legis.iowa.gov/docs/publications /LG/14975.pdf.

1995, and then engrafted other territory onto it later. This is not a sensible interpretation of a grandfather provision. It strikes us as analogous to the interpretation of the grandfather provision urged by the defendant in *State v. Finders*, 743 N.W.2d 546, 548–49 (Iowa 2008). In that case, the defendant had been charged with violating the sex offender residency restrictions. *Id.* at 547. He argued that he was exempt from those requirements because a grandfather provision in the law applied if "[t]he person has established a residence prior to July 1, 2002." *Id.* at 548 (alteration in original) (quoting Iowa Code § 692A.2A(4)(*c*) (2005), *repealed by* 2009 Iowa Acts ch. 119, § 31). The defendant had established a residence before July 1, 2002, but not the residence where he was staying when arrested in 2005. *Id.* at 547. Thus, as we indicated, "the crux of this case is whether it is the person or the address that is 'grandfathered' in a restricted zone." *Id.* at 548. While we acknowledged "the grandfather provision is not a model of clarity," we found that the interpretation urged by the defendant would lead to "an absurd result" and that the legislature's obvious intent was to protect specific residences that would otherwise violate the restrictions, not every sex offender who happened to have established a residence. *Id.* at 549.

Similarly, here, we think the legislature's concern was with an erosion of the tax base. Thus, its plain intent was to grandfather existing URAs, as opposed to grandfathering all URAs set up by a municipality just because the municipality had approved one economic development urban renewal project before the deadline. We think this purpose is even more clear because the legislature did not have the twenty-year time limit take effect immediately but gave municipalities until January 1, 1995, to operate under the old rules. 1994 Iowa Acts ch. 1182, § 15.

Once we agree the focus must be on the URA, the fatal flaw in the City's position is that it wants to have it both ways. In 2006, the City consolidated the Copper Creek URA with other URAs created after 1994 so it could share TIF revenue among them. In effect, TIF revenue from the Copper Creek URA has subsidized municipal projects in other parts of the City.

In 2003, in *Fults*, we held that the City of Coralville acted lawfully in consolidating two URAs so their TIF revenue could be shared. 666 N.W.2d at 552–55. We said,

> No statute prohibits a municipality from combining tax revenues within the combined urban renewal areas to fund a new project. To the contrary, the record shows it is common for a municipality to consolidate existing urban renewal areas to finance development of the community within the expanded urban renewal area. Further, the record reflects that it is not unusual for a municipality to use a highway right-of-way to join urban renewal areas. It was within the city's discretion to amend the original urban renewal areas and combine them to promote economic development in the Highway 6 area.

*Id.* at 553–54.

Presumably to take advantage of the *Fults* holding, the City combined URAs in 2006. Without that action, it would not have been able to use TIF revenue from the old Copper Creek URA outside the old Copper Creek URA. However, once the City "consolidated" URAs, the original Copper Creek URA no longer existed. The City's 2006 action was not a mere formality but had the desired legal effect of allowing the City to use TIF revenue from the Copper Creek URA outside the boundaries of the Copper Creek URA. As the City stated in 2006, "Changing economic needs and priorities now make it unnecessary to maintain each of the Urban Renewal Areas as a separate area . . . ." The City does not explain how a URA can cease to exist as a "separate area" for TIF revenue

sharing purposes and yet have its life extended seven years later as a separate area for grandfathering purposes. Chapter 403 does not contemplate, in our view, that a URA can both continue as it was and be consolidated at the same time. Hence, the City in June 2013 could not legally "extend" the June 1994 version of a URA that no longer existed.[9]

For these reasons, we find that the City lacked the authority in June 2013 to extend the Copper Creek URA and TIF arrangement for twenty additional years.

**B. The Use of Copper Creek URA TIF Revenue Outside the Copper Creek URA.** We now turn to whether the City can use TIF revenue from the old Copper Creek URA to fund street improvements and construction and other aspects of economic development outside the Copper Creek boundaries.

This requires us to interpret Iowa Code section 403.19(2)(*a*) (2013), which provides,

> That portion of the taxes each year in excess of [the baseline] amount shall be allocated to and when collected be paid into a special fund of the municipality to pay the principal of and interest on loans, moneys advanced to, or indebtedness, whether funded, refunded, assumed, or otherwise, including bonds issued under the authority of section 403.9, subsection 1, incurred by the municipality to finance or refinance, in whole or in part, an urban renewal project *within the area . . . .*

---

[9]The district court correctly noted that "[t]he provisions of Chapter 403 are to be liberally interpreted to achieve the purposes of the statute." *See* Iowa Code § 403.6 ("The provisions of this chapter shall be liberally interpreted to achieve the purposes of this chapter."). However, this raises the question of what the purposes of Chapter 403 are. According to the Sutherland treatise, "[c]ourts usually strictly construe savings clauses" except where needed "to prevent hardship by saving accrued rights and interests from the operation of a new rule." 2A Norman J. Singer & Shambie Singer, *Statutes and Statutory Construction* § 47.12, at 337–38 (7th ed. rev. 2014). In this case, there is no claim that rights accruing before the enactment of the 1994 legislation are at issue.

(Emphasis added.).

We think *Fults* answers this question. The City can consolidate economic development URAs and use TIF revenue from one former URA in another former URA. *See* 666 N.W.2d at 554–55. However, as we have already discussed, the City cannot then extend a former URA that no longer exists while simultaneously treating that former URA as integrated within a larger URA.[10]

To put it another way, we do not think the legislature intended in 1994 to allow a municipality to create a perpetual URA that would just be a general revenue pool for economic development purposes elsewhere in the City, and that does not actually describe an economic development area where TIF funds are being deployed. As a policy matter, such a revolving fund does not seem to further the purposes of TIF. *See* Iowa Code § 4.4(3) (setting forth the presumption that in enacting a statute, "[a] just and reasonable result is intended"). As we have already discussed, TIF is based generally on the premise that where development will lead to increased property value, it is fair to take the tax dollars that would otherwise be collected on that increased value and use them for costs associated with the development. This theory no longer works, however, when an area of a city was developed long ago, much of the increase in property value over past years is due to other factors and

---

[10]To be clear, a municipality that merges several economic development URAs after January 1, 1995, may find that the TIF division of revenue within the merged URA is subject to several different sunset dates. Iowa Code section 403.17(10) permits this. What the municipality cannot do, however, is take advantage of the grandfather provision to avoid the sunset date *altogether* in any portion of the merged URA. The grandfathering privilege is lost once the merger occurs and the pre-1995 URA no longer exists.

trends, and TIF funds are being used only to support development in another area of the city.

**C. Compliance with City Comprehensive Plan.** Iowa law requires that the urban renewal plan "[c]onform to the general plan for the municipality as a whole." Iowa Code § 403.17(24)(*a*); *see also id.* § 403.5(4)(*b*)(1). Concerned Citizens argues that the Amended Plan was inconsistent with the City's general plan as it then existed. According to Concerned Citizens, the 2013 amendment contemplated a light industrial warehouse development with related street improvements and construction, whereas the City's 2005 Comprehensive Development Plan provided for commercial use in the same area and did not mention several of the planned street improvements and construction.[11]

We have previously considered this conformity requirement in *Knudson* and *McMurray*. *McMurray*, 642 N.W.2d at 282; *Knudson*, 622 N.W.2d at 54–55. We, like the district court and the court of appeals, find our decision in *McMurray* controlling here.

In *McMurray*, a group of citizens joined together to challenge the City of West Des Moines's approval of an urban renewal plan, claiming it was not consistent with the general plan for the city in violation of what is now section 403.17(24)(*a*). *See* 642 N.W.2d at 274–75. The city had an agreement with a developer for a larger shopping center, now the Jordan Creek shopping mall. *Id.* at 275–76. The city did not mention the mall project in its urban renewal plan. *Id.* at 276. Rather, the plan "merely provided for the development and improvement of public infrastructures." *Id.*

---

[11]Subsequently, in the fall of 2013, the City amended its general plan to include a "commerce park" within the annexed land.

On the merits,[12] we found no violation of section 403.17(24)(*a*), reasoning,

> Opponents quite correctly point out the Plan does not state what type of private commercial development, if any, will arise out of the City's infrastructure improvements. However, the Plan also does not condition the infrastructure improvements on the completion of the GGP shopping mall or any other private commercial development. There is undisputed evidence in the record the infrastructure improvements provided for in the Plan have been a part of the City's capital improvement plan for years, even as far back as 1991. As the record shows, the GGP proposal merely served to accelerate what the City had already anticipated and planned for in terms of infrastructure development. Moreover, on appeal we, like the district court before us, are not reviewing the Agreement, including the proposed shopping mall, between the City and GGP. In fact, the proposed site plan for the development of the shopping mall has not yet been presented to the City Council for approval. At that time, the shopping mall will be compared to the comprehensive plan. Because the urban renewal project at issue does not include the proposed shopping mall, we do not address whether the Project conforms to the comprehensive plan.

*Id.* at 282.

We think the situation here is analogous. Although a light industrial warehouse was not a commercial use and would have been inconsistent with the City's general plan, the warehouse—like the Jordan Creek shopping mall—was not part of the June 2013 Amended Plan. Of course, the warehouse had already been featured in the City's grant

---

[12]Before reaching any of the merits in the case, we initially emphasized that "we have no power to interfere with the City Council's legislatively given discretion to carry out the purposes of the urban renewal law," and that "we presume the City Council, as a governing body of elected officials, acted in the overall best interests of the public." *McMurray*, 642 N.W.2d at 277. We added that "[c]ity councils are clearly vested with broad authority to carry out the goals of the urban renewal law." *Id.* at 278.

However, it is not clear whether these general statements applied to everything decided in *McMurray* or just to the first group of issues found under Part III.A of the court's opinion. *See id.* at 278–82.

application to the Department of Transportation, but *McMurray* indicates that compliance with Iowa Code section 403.17(24)(*a*) turns on a direct comparison between the urban renewal plan itself and the city's general plan. *See id.* at 282 ("[T]he urban renewal project consists of the undertakings listed in the Jordan Creek Urban Renewal Plan."). There was no direct inconsistency in the plans.

Certainly, the street improvements were part of the June 2013 Amended Plan. However, they in themselves were not inconsistent with the City's general plan, either. At most, one could say that the general plan did not mention some of these improvements.

A specific section of the City's 2005 comprehensive development plan described the City's goals for road development. This section included design requirements for any future thoroughfares and expansions of existing county roads. The general plan listed a number of streets expected to need widening or upgrade during the next twenty years, but nothing in the text indicated it was an exclusive list. The section specifically noted that collector and local streets "will play a major role in the future." The plan noted that roadways from rural sections to urban sections would be necessary for new development traffic flows. The general plan encouraged addressing connectivity among future developments. It specifically noted the importance of Highway 163 to the development of Pleasant Hill.

This is not a case like *Knudson*, where we reversed a summary judgment that had been granted to the municipality on the conformity question. *See Knudson*, 622 N.W.2d at 55. In that case, there was a direct conflict between the resolution approving the urban renewal plan, which called for a 4000 foot street ending in a cul-de-sac, and the city's general plan, which stated that "cul-de-sac streets . . . shall not be longer

than six hundred feet." *Id.* The present case is more akin to *McMurray*, where the urban renewal plan's infrastructure improvements "merely served to accelerate" development envisioned in the city's general plan. 642 N.W.2d at 282. Therefore, we uphold the district court's ruling on this point.

**IV. Conclusion.**

For the reasons stated, we reverse the district court's rulings that the City legally extended the duration of the Copper Creek URA and that TIF revenue from the Copper Creek URA can be used after the original twenty-year term expires to support development elsewhere in the City. We affirm its determination that the Plan Amendment conformed with the City's general plan. We therefore vacate the decision of the court of appeals, affirm the district court in part, reverse it in part, and remand for further proceedings consistent with this opinion.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Cady, C.J., takes no part.