**Erling HAUGLAND, Danniel W. Stuart, LeRoy Klaus, John Homelvig and Leo G. Heinz, Plaintiffs, Appellants and Cross-Appellees,**

v.

**CITY OF BISMARCK, Defendant, Appellee and Cross-Appellant,**

**Dougherty, Dawkins, Strand & Yost, Inc., and J. Daniel Halvorson, Intervenors, Appellees and Cross-Appellees.**

Civ. No. 880158.

Supreme Court of North Dakota.

Sept. 20, 1988.

**450**

Evans & Moench, Ltd., Bismarck, for plaintiffs, appellants and cross-appellees, argued by Dale W. Moench, Bismarck.

Beauclair & Cook, Bismarck, for defendant, appellee and cross-appellant, argued by James L. Norris, Bismarck.

Bucklin Trial Lawyers, P.C., Bismarck, for intervenors, appellees and cross-appellees, argued by David L. Graven. Appearances by Calvin N. Rolfson and John R. Green, Bismarck.

MESCHKE, Justice.

Taxpayers ask us to upset a three-step sale-leaseback-purchase financing arrangement by the City of Bismarck to fund $17,-000,000 in capital improvements, using a "nonappropriation mechanism" to avoid obligating the general taxing powers of the City. The trial court approved the arrangement. We affirm.

After exploring several alternatives, the City of Bismarck selected investment underwriters, Dougherty, Dawkins, Strand & Yost, Inc. (Dougherty), to prepare a financing plan for improvements to its civic center, memorial library, and a watermain. Under the plan adopted, the City transferred the properties to a trustee for $17,000,-000 and agreed to use the money to improve the properties. The trustee leased the properties back to the City for 15 years with annual lease payments sufficient to pay annual principal and interest due holders of certificates of participation issued by the trustee. The City retained the "rights and responsibilities of ownership" during the term of the lease with the right to purchase the properties for a nominal amount at the end of the lease term.

Under the "nonappropriation" clause, the leaseback was subject to cancellation by the City each year if it chose not to appropriate funds for an annual lease payment. Revenues from a city sales tax, together with a city lodging and restaurant tax, were expected to be more than sufficient to make the annual payments, but the City did

not pledge those tax revenues; rather, the City covenanted that it would not pledge those revenues "toward any purpose other than payment of Lease Payments during the Agreement Term."

After the first steps of the transaction in early October 1987, several adjustments were made. To obviate a potential real estate tax problem, the trustee reconveyed the properties to the City, conditional upon fulfillment of the lease-purchase agreement. Because of this taxpayers' suit in mid-October 1987, a Disbursement Agreement between the City and the Trustee provided that all of the funds would be held by the trustee pending the final outcome of this lawsuit.

Haugland and other taxpayers of the City sued to invalidate the transaction and to enjoin it, but a preliminary injunction was not sought. After trial, the trial court ruled that the City had statutory power to enter into the transaction, that the transaction did not violate the North Dakota Constitution and that the sales tax revenues could be used for lease payments.

Taxpayers appealed, arguing that the City did not have statutory power for the transaction, that the transaction violated the North Dakota Constitution and that the City was not authorized to use sales tax revenues for the annual lease payments. The City cross-appealed, claiming that the trial court should have dismissed taxpayers' claims because of their "laches".

## LACHES

The City argued, on its cross-appeal, that "laches should apply" because the City had entered into the transaction, thus changing its position, without any effort by the taxpayers to obtain a preliminary injunction. Thus, the City argued, "Haugland has not proceeded in a timely manner, nor was the proper procedure utilized."

Taxpayers pointed out that the funds are still in the hands of the trustee and have not been spent, arguing that "the City cannot make an illegal act legal simply by completing the act."

Laches is undue delay in commencing a suit which prejudices an adverse party through conditions changing during the delay. *Williams County Social Services Board v. Falcon*, 367 N.W.2d 170, 174 (N.D.1985). Laches is a question of fact. *North Dakota State Engineer v. Schirado*, 373 N.W.2d 904, 910 (N.D.1985). We do not disturb a finding of fact unless it is clearly erroneous. NDRCivP 52(a). The trial court determined that there was no evidence of delay by the taxpayers sufficient to bar their suit. We conclude that the trial court's finding that there was insufficient evidence of laches by these taxpayers, who commenced this suit in the same calendar month that the transaction was completed, was not clearly erroneous.

The City has cited some decisions from other states which have applied a form of laches and declined to invalidate municipal transactions after they have been completed. We believe that the North Dakota approach is represented by *Dahl v. City of Grafton*, 286 N.W.2d 774 (N.D.1980), which recognized that an individual taxpayer may be barred by laches from questioning a municipality's transaction but declined to apply laches to all taxpayers even five years after the challenged transaction.

## STATUTORY POWER

The taxpayers contended that the City had no statutory power to use this three-step financing arrangement to finance the capital improvements.

In January 1986, the City adopted a home rule charter providing for imposition of a city sales and use tax dedicated to capital improvements, debt retirement and property tax reduction. The sales and use tax was referred to the voters, who approved it in a November 1986 election. The voters also approved two additional propositions:

"Shall the City of Bismarck use local sales tax monies, when available, for the expansion of the Bismarck Veterans Public Library?

"Shall the City of Bismarck use local sales tax monies, when available, for the

expansion of the Bismarck Civic Center?"

In April 1987, the City also adopted a city lodging and restaurant tax to be spent for acquisition and maintenance of buildings and property consistent with visitor attraction and promotion under NDCC ch. 40–57.-3.

While a home rule city can have broad powers over its property and "to control its finances and fiscal affairs" if those powers are "included in the charter and implemented through ordinances," (*see* NDCC 40–05.-1–06) the City of Bismarck has not done so. Therefore, its powers are those bestowed by the legislature on all municipalities. NDCC 40–05–01. Five of them are involved in this case:

"*40–05–01. Powers of all municipalities.* The governing body of a municipality shall have the power:

\*  \*  \*  \*  \*  \*

"2. Finances and property. To control the finances, to make payment of its debts and expenses, to contract debts and borrow money, to establish charges for any city or other services, and to control the property of the corporation.

\*  \*  \*  \*  \*  \*

"5. Borrowing money. To borrow money on the credit of the corporation for corporation purposes and to issue bonds therefor as limited and provided by title 21.

\*  \*  \*  \*  \*  \*

"50. Public buildings. To construct, operate, and maintain all public buildings necessary for the use of the municipality.

\*  \*  \*  \*  \*  \*

"55. Real and personal property. To acquire by lease, purchase, gift, condemnation, or other lawful means and to hold in its corporate name for use and control as provided by law, both real and personal property and easements and rights of way within or without the corporate limits for all purposes authorized by law or necessary to the exercise of any power granted.

"56. Transfer property. To convey, sell, dispose of, or lease personal and real property of the municipality as provided by this title."

Although the taxpayers argued that the transaction was an unauthorized mortgaging of municipal property, their principal claim was that subsection 5 is the exclusive method for the City to borrow money. They contended that the City may only finance the improvements by issuing general obligation bonds pursuant to NDCC ch. 21–03, referenced by subsection 5.

Although the City argued that the power to sell municipal property implies the lesser power to mortgage municipal property, it primarily argued that it had the authority to sell any city property, to lease property and to acquire property, emphasizing subsections 55 and 56, and the "step" nature of the transaction. The City submitted:

"Since there is expressed statutory authority for a sale by the City and a lease by the City, this is all the authority necessary to provide the City with its authority for its sale of the Facilities to the Trustee and the subsequent lease by the City from the Trustee of these same assets. Section 40–05–01(55) and (56) provide the City with implied authority to combine a sale and leaseback in the same transaction."

Recognizing that this step transaction was essentially a financing transaction, the City insisted that subsection 5 is not the exclusive means for a city to borrow money, but only the specific source of power for a city to borrow money when it issues general obligation bonds. The City urged that subsection 2 is "an express authorization for the City to select alternative methods of financing capital improvements." The City's argument used the "nonappropriation mechanism" to make clear that the general taxing powers of the City are not "obligated." This mechanism was spelled out in a series of clauses in the Official Statement prepared in connection with the issuance of certificates of participation, the Trust Agreement and the Lease–Purchase Agreement:

Official Statement:

*"Non-appropriation and Default:* The City may terminate the Lease Agreement, at its option, if the City does not appropriate funds to make Lease Payments. In addition, the Lease Agreement may be terminated by the Trustee upon an event of default. In the event of such termination, the recourse of the Certificate Holders would be to take possession of the Facilities and operate the Facilities or sell their interest in the Land and Facilities, since the City is only liable for Lease Payments for the then current fiscal year for which it has appropriated funds. There is no certainty that the remedies available to the Certificate Holders would produce sufficient funds to completely pay the Certificate Holders."

Trust Agreement, Article VI, § 6.04:

*"No Obligation by the City to Owners.* Except for the payment of Lease Payments when due in accordance with the Agreement and the performance of the other covenants and agreements of the City contained in the Agreement and in this Trust Agreement, the City shall have no obligation or liability to any of the other parties or to the Owners of the Certificates with respect to this Trust Agreement or the terms, execution, delivery or transfer of the Certificates, or the distribution of Lease Payments to the Owners by the Trustee."

Lease–Purchase Agreement, Article II, § 2.01:

*"Representations, Covenants and Warranties of City.*

\* \* \* \* \* \*

"(h) Except to the extent specifically provided herein, the City is not obligated to appropriate or otherwise provide moneys for the payment of the Lease Payments or any other amounts coming due hereunder; and in the event of Non-appropriation by the City Commission, the City shall not be liable for general, special, incidental, consequential or other damages resulting therefrom. This Agreement does not constitute a general obligation of the City, and the full faith and credit and taxing powers of the City are not pledged for the payment of the Lease Payments or other amounts coming due, or other actions required to be performed hereunder."

▇▇▇ In our view, NDCC 40–05–01(2) generally authorizes a municipal governing body to control municipal finances, pay its debts and expenses, contract debts and borrow money, and to control municipal property. Section 40–05–01(5) specifically authorizes the borrowing of money by issuing bonds in accordance with NDCC title 21. Subsection 5 does not provide the exclusive method of borrowing money, but specifies one method of exercising the borrowing authority granted in subsection 2, particularly when general taxing powers are obligated. Section 40–05–01(56) specifically authorizes a municipal governing body to convey, sell, or dispose of municipal property.[1] Section 40–05–01(50) specifically authorizes a municipal governing body to construct public buildings. Section 40–05–01(55) specifically authorizes a municipal governing body to acquire real property by lease or purchase.

Thus, the City had statutory authority to sell existing facilities, construct facilities, and lease facilities. The question is whether the City had the statutory power to fund improvements to its existing facilities in a three-step sale-leaseback-purchase transaction.

▇▇▇ In defining municipal powers, the rule of strict construction applies. *Lang v. City of Cavalier,* 59 N.D. 75, 228 N.W. 819 (1930). Once a municipality's powers have been determined, however, "the rule of strict construction no longer applies, and the manner and means of exercising those

---

1. Related statutes specify certain requirements for the transfer of municipal property. *See* NDCC 40–11–04, 40–11–04.1, and 40–11–04.2. The City did enact an ordinance pursuant to these sections and followed the procedures in that ordinance in selling the existing facilities.

We see no error in the trial court's determination that "the city did dispose of [the] property pursuant to Chapter 40–11, and in full compliance with that chapter's requirements of notice, bidding, and all other requirements."

powers where not prescribed by the Legislature are left to the discretion of the municipal authorities." *Id.,* 228 N.W. at 822. Leaving the manner and means of exercising municipal powers to the discretion of municipal authorities implies a range of reasonableness within which a municipality's exercise of discretion will not be interfered with or upset by the judiciary. *See, e.g., Tayloe v. City of Wahpeton,* 62 N.W. 2d 31, 35 (N.D.1953) (courts will not declare ordinances invalid unless they are "clearly arbitrary, unreasonable and without relation to public health, safety, morals or public welfare."); *Marks v. City of Mandan,* 70 N.D. 474, 296 N.W. 39, 45 (1941) (reasonable exercise of legislative discretion "does not invade constitutional rights of general taxpayers"); 62 C.J.S. *Municipal Corporations* § 203, pp. 378–379 (1949) ("As a general rule, the reasonableness of municipal action is subject to review and inquiry by the courts.... While courts are reluctant to declare municipal regulations or other acts invalid by reason of their unreasonableness, ..., when such unreasonableness clearly appears, the courts may declare them invalid.").

Taxpayers asserted that a step-transaction lease-purchase of new facilities, with a nonappropriation clause, would be a statutorily permissible transaction with which they would have no argument if existing city facilities were not at risk of loss. There is little, if any, functional difference in losing existing facilities and losing the equity acquired in new facilities through payments made pursuant to a lease-purchase agreement. A risk of loss of city property does not necessarily preclude the use of a step transaction by a city's exercise of the powers granted in NDCC 40–05–01(2), (50), (55) and (56).

*Lang v. City of Cavalier, supra,* involved an agreement under which Cavalier agreed to provide an electrical distribution system and a building in which an electric generating plant would be installed by the Fairbanks–Morse Company. Cavalier agreed to pay for the plant in installments evidenced by pledge orders. If the city failed to pay any pledge order, the company could repossess the machinery and equipment. This court rejected the following arguments in a taxpayer's challenge of the arrangement:

"The plaintiff contends that this contract is merely a subterfuge resorted to for the purpose of evading the constitutional safeguard against excessive indebtedness; that, regardless of the terms of the contract and the verbal devices employed therein, the electric plant becomes the property of the city, and the city becomes obligated to pay the purchase price thereof; that, though a special fund is created out of the proceeds from the sale of light and power, such proceeds are the property of the city, and thus the city's property is to be used in discharging the obligation; that, in case of default at any time, even though the city is not generally liable, the property may be repossessed and sold, and, where a portion of the purchase price has been paid, to that extent, at least, the city's property is taken to discharge the obligation." 228 N.W. at 824.

Thus, the holding in *Lang v. City of Cavalier, supra,* makes clear that some municipal property may be placed at risk of loss in financing improvements. Questions as to the extent of property that may be placed at risk and the degree of risk of loss to which it may be subjected are matters of legislative judgment and discretion on the part of municipal authorities, subject to reasonable exercise and judicial review for reasonableness.

■ We conclude that the three-step sale-leaseback-purchase transaction employed by the City to fund the construction of improvements to its civic center, library and a watermain, with a nonappropriation mechanism to make clear that its general taxing powers are not obligated, was a reasonable exercise of the general powers granted in NDCC 40–05–01(2), and the specific powers granted in NDCC 40–05–01(50), (55) and (56).

## DEBT LIMIT

Taxpayers argued that this step financing transaction constituted a general obli-

gation debt that violated the North Dakota Constitution, particularly sections 15 and 16 of Art. X:

"*Section 15.* The debt of any county, township, city, town, school district or any other political subdivision, shall never exceed five per centum upon the assessed value of the taxable property therein; provided that any incorporated city may, by a two-thirds vote, increase such indebtedness three per centum on such assessed value beyond said five per centum limit, and a school district, by a majority vote may increase such indebtedness five percent on such assessed value beyond said five per centum limit; provided also that any county or city by a majority vote may issue bonds upon any revenue-producing utility owned by such county or city, or for the purchasing or acquiring the same or building or establishment thereof, in amounts not exceeding the physical value of such utility, industry or enterprise.

"In estimating the indebtedness which a city, county, township, school district or any other political subdivision may incur, the entire amount, exclusive of the bonds upon said revenue-producing utilities, whether contracted prior or subsequent to the adoption of this constitution, shall be included; provided further that any incorporated city may become indebted in any amount not exceeding four per centum of such assessed value without regard to the existing indebtedness of such city for the purpose of constructing or purchasing waterworks for furnishing a supply of water to the inhabitants of such city, or for the purpose of constructing sewers, and for no other purposes whatever. All bonds and obligations in excess of the amount of indebtedness permitted by this constitution, given by any city, county, township, town, school district, or any other political subdivision shall be void."

"*Section 16.* Any city, county, township, town, school district or any other political subdivision incurring indebtedness shall, at or before the time of so doing, provide for the collection of an annual tax sufficient to pay the interest and also the principal thereof when due, and all laws or ordinances providing for the payment of the interest or principal of any debt shall be irrepealable until such debt be paid."

Taxpayers argued that the "debt" is void under these constitutional provisions.

The City argued that the nonappropriation mechanism made it clear "that the City has not pledged the full faith and credit of the City to make lease payments, that the City has not legally obligated itself to make any appropriation and that if no appropriation is made that the City has no liability...."

A discussion of lease-purchase agreements and nonappropriation clauses may be found in Bisk, *State and Municipal Lease–Purchase Agreements: A Reassessment,* 7 Harvard Journal of Law and Public Policy 521 (1984). That author concluded that "[t]he nonappropriation framework provides an effective tool for encouraging lease-purchasing while meeting debt limitation safeguards." *Id.,* at 550.

■ The parties agreed that five per cent of the City's 1987 assessed value of $596,076,177 is $29,803,808. Before this transaction, the total existing general obligation bonded indebtedness subject to the constitutional debt limit for the City was $4,340,000. It is apparent that if the obligation of this transaction is deemed "debt" for constitutional purposes, the City's total debt is still within constitutional limits. Thus, it is unnecessary for this court to decide, at this time, whether this obligation of the City is "debt" under Section 15 of Article X of the Constitution.

■ Section 16 of Article X does not apply because there is no general obligation of the taxing power of the City for this financing transaction. *See* Syllabus ¶ 1, *Schieber v. City of Mohall,* 66 N.D. 593, 268 N.W. 445 (1936) ("debt" and "indebtedness" as used in § 183, N.D. Const. [now Art. X, § 15], refer to pecuniary obligations imposed by contract, except obligations to be satisfied out of current revenue). The lease-purchase agreement specifically says that it does not constitute a

general obligation of the City, that its taxing powers are not pledged for payment of the lease payments, that the City may terminate the agreement by not appropriating funds to make lease payments, and that the City is only liable for lease payments for the current fiscal year for which it has appropriated funds. "Payment of the obligations having been provided without resort to general taxation, they are not such obligations as are contemplated by [§ 184, N.D. Const. (now Art. X, § 16) ]." *Marks v. City of Mandan, supra,* 296 N.W. at 47.

## USE OF SALES TAX

Taxpayers contended that the contemplated payments do not comply with the city sales tax ordinance dedicating sales tax revenue to capital improvements, debt retirement and property tax reduction. Taxpayers also contended that the contemplated payments violate NDCC 40–40–05, which requires that proposed expenditures be segregated into current expenditures, capital expenditures, and debt service expenditures.

We agree with the trial court's determination that "[t]he lease purchase is in conformity with use for capital improvements in that the city is acquiring a capital improvement." And, we are not persuaded that the contemplated use of city sales tax revenue violates NDCC 40–40–05, which deals with the preparation of preliminary municipal budget statements.

The judgment is affirmed.

VANDE WALLE, Acting C.J., LEVINE, GIERKE, JJ., and VERNON R. PEDERSON, Surrogate Justice, concur.

VERNON R. PEDERSON, Surrogate Justice, sitting in place of ERICKSTAD, C.J., disqualified.