Karen **FULTS** and Wayne **Siems, Appellants,**

v.

**CITY OF CORALVILLE, Appellee.**

No. 02–1857.

Supreme Court of Iowa.

June 11, 2003.

Rehearing Denied Aug. 7, 2003.

Bruce D. Nestor of De Leon & Nestor, Minneapolis, Minnesota, for appellants.

Dennis W. Johnson of Dorsey & Whitney, Des Moines, for appellee.

STREIT, Justice.

Property owners challenge a city's amending two urban renewal areas to support the development of a hotel and conference center. The City of Coralville amended two distinct urban renewal areas to include the highway corridor connecting the two areas and consolidated both into one urban renewal area. To finance, in part, the hotel/conference center project, the city took out $33 million in notes and bonds. Property owners in the urban renewal area challenge the city's inclusion of the highway corridor in the economic development area to support the creation of the consolidated urban renewal area. The property owners also argue the city exceeded its constitutional debt limitation in taking out $33 million in notes and bonds. Because we find the city complied with the urban renewal law of Iowa Code chapter 403 and the appropriations-backed "debt" does not constitute constitutional debt, we affirm.

## I. Background and Facts

■ The City of Coralville established the Highway 6 Urban Renewal Area in 1992. Five years later, it created the Mall Urban Renewal Plan Area to finance development of the Coral Ridge Mall. In 2001, the city amended its general plan to include a hotel/convention center (the "project") to be built in the Highway 6 Urban Renewal Area. However, this area alone would not generate sufficient tax increment financing (TIF) revenue to fund the project.[1] To resolve this problem, the city consolidated the two previously existing urban renewal areas to finance the project. The two areas were connected by Interstate 80. Each of the original urban renewal plans was modified to include the I-80 corridor, a strip of land along the interstate from the Coral Ridge Mall east to Highway 6. The addition of the Interstate 80 corridor to each of the previously existing urban renewal areas physically and visually connected the two urban renewal areas. The city called this newly created area the "Mall and Highway 6 Urban Renewal Plan Area" (the "plan").

To finance the hotel project's construction, the city approved a financing project of $20 million in notes and $13 million in bonds. The notes and bonds were contingent obligations subject to repayment only if the city would annually appropriate the funds necessary for repayment.

---

1. Tax increment financing is the power to fund public improvements granted to a municipality by the legislature. . Iowa Code § 403.19 (2001). This method of public financing "presupposes that redevelopment will increase property values, and hence increase the tax base, of properties in the project area." *City of El Monte v. Comm'n on State Mandates*, 83 Cal.App.4th 266, 99 Cal. Rptr.2d 333, 334 (2000). The municipality may fund public improvements "in an area slated for redevelopment by recapturing, for a time, all or a portion of the increased property tax revenue that may result if the redevelopment stimulates private reinvestment." *Princeton City Sch. Dist. Bd. of Educ. v. Zaino*, 94 Ohio St.3d 66, 760 N.E.2d 375, 378 (2002). The property taxes that are generated from the base value of the area are distributed to the various taxing entities. The incremental taxes generated from any increased property value above the base value, i.e. the excess, are allocated to the city to finance the public improvement in the urban renewal area. In the instant case, the excess TIF revenues generated by the Highway 6 urban renewal area, on its own, would be insufficient to finance the construction of the hotel/conference center. By consolidating the two urban renewal areas, the surplus TIF revenues from the expanded urban renewal area would provide sufficient revenue to fund the project.

Plaintiffs Karen Fults and Wayne Siems are residents of the City of Coralville and owners of property in the Highway 6 .Urban Renewal Area (the "property owners"). The property owners filed a petition for declaratory judgment challenging the city's financing of the project. The property owners argued the consolidation of the two urban renewal areas was invalid because the I–80 right-of-way cannot be designated an urban renewal area for economic development. The property owners also challenged the city's compliance with the statutory procedure for issuing the bonds and notes. Finally, the property owners asserted the city's issuance of notes and bonds caused the city to exceed its constitutional debt limit. The property owners sought a declaration of the appropriate assessment to be used in setting the base valuation and the portion of taxes reserved to the respective taxing districts.

The district court ruled in favor of the city on each issue and dismissed the property owners' petition. The property owners appeal contending the city's designation of the I–80 right-of-way as an economic development area was arbitrary, capricious, or unreasonable. The property owners also argue the annual appropriation debt constitutes debt subject to the debt limitation provision of the Iowa Constitution.

## II. The Merits

■■■ On appeal, we examine two main issues. The property owners ask us to determine whether the district court erred in finding the city properly designated the I–80 right-of-way as an economic development area. Our review of this issue is for correction of errors of law. *Iowa Coal Min. Co. v. Monroe County*, 494 N.W.2d 664, 668 (Iowa 1993). We also consider whether the district court erred in finding the city's annual appropriation obligations do not constitute constitutional debt. As to the second issue, our review is de novo because constitutional issues are involved. *Id.*

## A. Designation of the Urban Renewal Area

■■■ The property owners challenge the city's inclusion of the I–80 corridor as part of the consolidated urban renewal area. The property owners misconstrue the real issue before us by concentrating their argument on the legality of declaring the I–80 corridor itself an economic development area. We do not review whether the I–80 right-of-way as it stands alone complies with chapter 403, but rather whether the Mall and Highway 6 Urban Renewal Area (of which the I–80 right-of-way is a part) is consistent with our state urban renewal law. Property owners have the heavy burden of showing the city's designation of this urban renewal area was arbitrary, unreasonable, or capricious. *Dilley v. City of Des Moines*, 247 N.W.2d 187, 190 (Iowa 1976).

■■■ As we have said before, it is critical to examine the nature of the city council's action to determine whether the city acted in conformance with the urban renewal laws of Iowa Code chapter 403. *McMurray v. City Council*, 642 N.W.2d 273, 277 (Iowa 2002). A municipality is vested with "all the powers necessary or convenient to carry out and effectuate the purposes and provisions of [chapter 403.]" Iowa Code § 403.6 (2001). In *McMurray*, we summarized the proper actions of a city council in achieving the purposes of our urban renewal statute as follows:

In general, the City Council acts in a legislative capacity. Chapter 403 grants city councils authority to carry out urban redevelopment, rehabilitation, and renewal projects. As such, the City Council's action in designating this eco-

nomic development area involved determination of legislative, not judicial, facts. Legislative facts are "generalized propositions of fact or policy guiding the exercise of legislative judgment." (Citation omitted.) Moreover, legislative facts are not concerned with particular problems of individuals, but involve a determination of what is in the best interests of the public generally. *Trager v. Peabody Redevelopment Auth.*, 367 F.Supp. 1000, 1002 (D.C.Mass.1973) ....

Such decisions by the city council involving legislative facts necessarily involve the exercise of considerable discretion. Legislative declarations, such as the one before us, are entitled to great weight. *See, e.g., Miller v. City of Tacoma,* [61 Wash.2d 374] 378 P.2d 464, 470 (Wash. 1963).... Consequently, we have no power to interfere with the City Council's legislatively given discretion to carry out the purposes of the urban renewal law. *See, e.g., Dilley v. City of Des Moines,* 247 N.W.2d 187, 192 (Iowa 1976).... Rather, we presume the City Council, as a governing body of elected officials, acted in the overall best interests of the public.

*McMurray,* 642 N.W.2d at 277. Bearing in mind the wide discretion city councils have in carrying out our urban renewal laws, we turn to whether the city in this particular case complied with the requirements of chapter 403.

Iowa Code chapter 403 provides that one reason a municipality may create an urban renewal area is to encourage general economic development for a community. Iowa Code § 403.2(3); *see McMurray,* 642 N.W.2d at 278 (citing *Bowers v. Polk County Bd. of Supervisors,* 638 N.W.2d 682, 697 (Iowa 2002)). In this instance, the city had already created two separate

urban renewal areas.[2] The Mall Urban Renewal Area already had substantial development, while the Highway 6 Urban Renewal Plan remained relatively unchanged. By resolution, the city council amended the Highway 6 Urban Renewal Area and the Mall Urban Renewal Area and created the Mall and Highway 6 Urban Renewal Area. The city combined these two areas to use the success and stability of the Mall Urban Renewal Area to assist in the economic development of the Highway 6 Urban Renewal Area.

 It is common for a municipality to amend urban renewal areas to respond to changing needs and circumstances. Once a city adopts an urban renewal plan, it may modify the original plan through additional resolutions. Iowa Code section 403.5(6) states,

> Upon approval by the municipality of an urban renewal plan or of any modification thereof, such plan or modification shall be deemed to be in full force and effect for the respective urban renewal area, and the municipality may then cause such plan or modification to be carried out in accordance with its terms.

Iowa Code § 403.5(6). Property owners do not contend the city is prohibited from consolidating urban renewal areas, especially those areas that are not contiguous. No statute prohibits a municipality from combining tax revenues within the combined urban renewal areas to fund a new project. To the contrary, the record shows it is common for a municipality to consolidate existing urban renewal areas to finance development of the community within the expanded urban renewal area. Further, the record reflects that it is not unusual for a municipality to use a highway right-of-way to join urban renewal

---

**2.** The property owners do not challenge the designation of either the Highway 6 Urban Renewal Area or the Mall Urban Renewal Plan Area.

areas. It was within the city's discretion to amend the original urban renewal areas and combine them to promote economic development in the Highway 6 area. The question is whether the city's declaration of the consolidated areas as one economic development area to support the creation of the Mall and Highway 6 Urban Renewal Plan Area complied with chapter 403.

Before a municipality may designate an urban renewal area, it must pass a resolution finding the area is a slum or blighted area, or an economic development area. The municipality must further find development in the area is necessary in the public interest. In this case, we are reviewing the creation of an economic development area to support the urban renewal designation. Iowa Code chapter 403 defines an economic development area, in part, as:

> an area of the municipality designated by the local governing body as appropriate for commercial and industrial enterprises, public improvements related to housing and residential development, or construction of housing and residential development for low and moderate income families, including single or multi-family housing....

Iowa Code § 403.17(10).

■ The urban renewal statutes provide a "a municipality shall not approve an urban renewal project for an urban renewal area unless the governing body has, by resolution, determined the area to be a[n] ... economic development area ... and designated the area as appropriate for an urban renewal project." *McMurray*, 642 N.W.2d at 279 (citing Iowa Code § 403.5(1)). A city council is under no statutory obligation "to make specific findings" before declaring an area as an economic development area suitable for designation as an urban renewal area. *Id.* "[T]he statute merely requires a declara-

tion by the City Council in the resolution of necessity the area is suitable for economic development to support and stimulate commercial and industrial growth." *Id.*

In the case before us, the city council complied with the provisions for declaring the property an economic development area within an urban renewal area. The city council stated the purpose of the Plan was

> to encourage the continued stability and economic well-being of the City of Coralville through the support of economic development and redevelopment within the area.... The primary goals ... are to stimulate, through public action and commitments, private investments in development and redevelopment.

The Plan was to "encourage economic development by providing infrastructure improvements to accommodate development of a vital, dynamic and competitive regional commercial area for the City of Coralville and the surrounding region." The city council also passed a resolution of necessity pursuant to Iowa Code section 403.4, stating "investigations have been conducted which show the desirability of expanding the urban renewal areas to add and include all property shown [including the I–80 right of way] ...." The resolution stated the Plan was "necessary in the interest of the public health, safety or welfare of the residents" of the city. The resolution said "sufficient need exists to warrant finding" the area of the I–80 corridor "to be an economic development area...."

The city council further complied with the remaining statutory requirements of chapter 403. The council submitted the proposed plan to the Planning and Zoning Commission for approval as required by Iowa Code section 403.5(2). The city held a public hearing on January 8, 2002, for

the purpose of discussing the designation of the new Mall and Highway 6 Urban Renewal Plan Area. *See id.* § 403.5(3). Notice of the hearing was published as required.

The property owners make a final effort to challenge the motives behind the city's designation of this economic development area to support the urban renewal plan. However, we have consistently said we do not examine "the motives of those exercising legislative power in a manner which is not manifestly arbitrary, capricious, or unreasonable." *Dilley,* 247 N.W.2d at 192; *accord McMurray,* 642 N.W.2d at 280 ("It is not within our province to decide whether the City made a good or bad decision in designating this economic development area."). In 1985, the legislature gave municipalities authority to adopt an urban renewal plan based solely upon the existence of an economic development area. The reason behind this amendment to chapter 403 was to "stem economic decline and promote economic growth." *McMurray,* 642 N.W.2d at 281; *see also* 1985 Iowa Acts ch. 66, § 1 (codified at Iowa Code § 403.2(3) (1987)). Given this stated purpose of the urban renewal statute, we conclude the city's action in this case was reasonable.

In designating the Mall and Highway 6 Urban Renewal Plan Area, the city promoted one of the main goals of chapter 403, i.e., to encourage and assist various industrial and commercial enterprises in locating to the State of Iowa. *See McMurray,* 642 N.W.2d at 281–82. It was reasonable for the city to consolidate two urban renewal areas in an effort to increase the viability of both areas and the proposed project. Including the I–80 corridor in the consolidated urban renewal area was also reasonable. The record shows the city took such action to "improve the appearance of the corridor," to "enhance the iden-

tity of the metro area," and to "complement adjoining areas." The land use plan indicates, as a general planning goal, the city hoped to "enhance the community image" with the I–80 corridor by improving the aesthetics along the corridor and linking the Iowa City and Coralville developments. The property owners have shown nothing more than their disagreement over whether the urban renewal area is viable. Their disagreement is insufficient to render the city's action unreasonable. As such, they have not met their burden to prove the city's action was unreasonable, arbitrary, or capricious.

In sum, because the city council followed the requirements of the Iowa Code in designating the consolidated property an economic development area, we will not interfere with the city's decision. It was a matter based upon public policy and we will not second-guess whether it was a "good or bad decision." *See id.* at 280. Because the property owners have failed to show the city's actions in designating the economic development area were arbitrary, capricious, or unreasonable, we affirm.

### B. Constitutional Debt Limitation

The second issue is whether the annual appropriation obligations to repay the debt on the bonds and notes constitute constitutional debt subject to the limitation of article XI, section three of the Iowa Constitution. Property owners contend the TIF plan at issue, including the notes and bonds, cause the city to exceed its constitutional debt limitation. The property owners also argue the city failed to comply with the requirements of Iowa Code sections 384.24(3)(q) and 384.25(2) (2001) for a public hearing on the matter. The city argues its repayment obligation is conditional on yearly appropriations and is

therefore not subject to the constitutional debt limitation.

We begin our discussion considering whether the city complied with the public hearing requirements related to financing issues for urban renewal areas. The applicable code provisions state, in part,

Before the council may institute proceedings for the issuance of bonds for an essential corporate purpose, a notice of the proposed action, including a statement of the amount and purposes of the bonds, and the time and place of the meeting at which the council proposes to take action for the issuance of the bonds, must be published as provided in section 362.3. At the meeting, the council shall receive oral or written objections from any resident or property owner of the city. After all objections have been received and considered, the council may, at that meeting or any adjournment thereof, take additional action for the issuance of the bonds or abandon the proposal to issue the bonds.

Iowa Code § 384.25(2).

The property owners argue the notice published in January 2002 did not contain information of the contingent nature of the loans or of the effect the loans may have on the municipal credit rating. However, absent in the statute quoted above is any language that the city shall provide notice of these particular matters. The city was required to substantially comply with the statutes. See Green v. City of Cascade, 231 N.W.2d 882, 885 (Iowa 1975) (substantial compliance is required for the valid issuance of municipal general obligation bonds by a city). The city has substantially complied with the notice provision. The notice precisely stated the amount of the proposed bonds, the urban renewal purpose, and the public's right to petition. Further, the notice expressly stated repayment of the notes and bonds is "subject to the right of nonappropriation by the City Council each fiscal year." We now turn to the critical issue which is whether the notes and bonds constitute constitutional debt. If we find these loans are subject to the constitutional debt limitation, the city would exceed its debt limit.

The Iowa Constitution limits municipalities to indebtedness no greater than five percent of the total value of property within the corporate limits of the municipality. Iowa Const. art. XI, § 3. The city has a debt limitation of approximately $50 million. The city presently has $39 million in outstanding constitutional debt. Both parties agree that the $33 million of bonds and notes financing the project, or either part of it, would exceed the city's debt limitation, if considered constitutional debt.

The Iowa Constitution imposes a limitation on the amount of debt a political subdivision may create to "prevent the general taxes of a political subdivision from becoming overburdened by obligations." Richards v. City of Muscatine, 237 N.W.2d 48, 64 (Iowa 1975); accord Banta v. Clarke County, 219 Iowa 1195, 1200–02, 260 N.W. 329, 336 (1935) (purpose of constitutional debt limitations is to confine indebtedness within certain limits). If there is no legally enforceable obligation to continue repayments in the future, such "debt" is not considered constitutional debt. Constitutional debt exists only when it

appear[s] such contingency is sure to take place irrespective of any action taken or option exercised by the city in the future. That is, if a present indebtedness is incurred or obligations assumed which, without further action on the part of the city, have the effect to create an indebtedness at some future day, such

are within the inhibition of the constitution.

But, if the fact of indebtedness depends upon some act of the city, or upon its volition to be exercised or determined at some future day, then no present indebtedness is incurred, and none will be until the period arrives, and the required act or option is exercised, and from that time only can it be said there exists an indebtedness.

*Burlington Water Co. v. Woodward,* 49 Iowa 58, 62 (1878); *accord Windsor v. City of Des Moines,* 110 Iowa 175, 187–88, 81 N.W. 476, 478 (1900). A city's "debt" is not considered constitutional debt where "none of its resources or property can be taken for, or subjected to, the payment of any bond." *Interstate Power Co. v. Town of McGregor,* 230 Iowa 42, 56, 296 N.W. 770, 777 (1941). Where the holder of the security has no recourse against the city in the event of non-payment, there is no debt in the constitutional sense. *See Employers Ins. Co. v. State Bd. of Exm'rs,* 117 Nev. 249, 21 P.3d 628, 632 (2001).

To determine whether the city has bound itself to repay its debts, we look to the document creating the claimed obligation. The loan agreement for the notes read,

> The Notes are special, limited obligations of the City, payable from amounts on deposit in the City's Debt Service Fund, and other revenues and funds, to the extent lawfully available for such purpose, but *subject to nonappropriation in any fiscal year.* The Notes do not constitute a general obligation of the City or other financial obligation of the City for any fiscal year and shall not constitute debt within the meaning of any constitutional debt limitation. The Notes shall not directly or indirectly obligate the City to make payments thereon during a fiscal year beyond those for which funds have been appropriated by the City Council for such fiscal year.

> In the event that the City Council … does not budget and appropriate funds for any fiscal year in an amount sufficient to meet the payments of interest and principal due under the Notes during such fiscal year …, the City's *obligations under the Notes shall terminate and become null and void on the last day of the fiscal year for which the necessary funds were appropriated.*

(Emphasis added.) The bonds contained substantially similar language indicating the city's repayment of the bonds was "subject to nonappropriation in any fiscal year."

 There is nothing in the agreements creating the notes and bonds that binds the city to any particular future course of action. Each year, it is the option of the city council to appropriate the necessary money for repayment. If the city council does not appropriate money for this purpose, the city is not bound to repay the remaining amount on the notes and bonds. These notes and bonds are debts only if each year the city council says they are debts. This is the very essence of debt that does not constitute constitutional debt. The repayment of a debt that is not certain to take place regardless of future events is not subject to the constitutional debt limitation. The contingency provided for in the case before us, i.e., appropriation of funds for repayment, can hardly be said to be "sure to take place irrespective of any action taken or option exercised by the city in the future." *See Woodward,* 49 Iowa at 62.

Property owners argue the practical effect of the language creating the notes and bonds is that the city has "pledged" to repay the money. Specifically, property owners assert "[w]hen a future city council faces the decision of whether to cause [a

nonappropriation] to happen, it will both morally and practically be in a position where it must continue to appropriate general tax revenues." Property owners predict a certain disastrous result of nonappropriation; the city's inability "to borrow money for even essential city services or of having that money at higher interest rates." Given these claimed consequences of a nonappropriation, the property owners, in essence, argue the city has morally bound itself to repay the notes and bonds. Because of the likelihood of repayment, the property owners urge us to expand the definition of constitutional debt to include appropriations-backed debt. We are not persuaded by their contention.

■■■ "A moral obligation ... is not in and of itself 'debt.' " *Schulz v. State,* 84 N.Y.2d 231, 616 N.Y.S.2d 343, 639 N.E.2d 1140, 1148 (1994). "[T]his is an extra-legal consideration urged on the basis of an undemonstrated detrimental effect of a possible default upon the State's general reputation and credit rating." *Wilmington Med. Ctr., Inc. v. Bradford,* 382 A.2d 1338, 1349 (Del.1978). That is, the constitutional debt limitation provision of our constitution applies to legally enforceable obligations, not to moral obligations. *See In re Okla. Capitol Improvement Auth.,* 958 P.2d 759, 768 (Okla.), *cert. denied, Fent v. Okla. Capitol Improvement Auth.,* 525 U.S. 874, 119 S.Ct. 174, 142 L.Ed.2d 142 (1998); *State ex rel. Kane v. Goldschmidt,* 308 Or. 573, 783 P.2d 988, 993 (1989). Though the consequences that could follow from the city's nonappropriation may serve to assure creditors of repayment, this assurance does not constitute a legal obligation. *Id.* Even if the practical effect of these agreements is that the city will repay the notes and bonds, this does not affect our analysis as long as the city cannot be held legally responsible for the debt for a year other than one in which funds have been appropriated. *See Mun. Bldg. Auth. v. Lowder,* 711 P.2d 273, 279 (Utah 1985). The claimed expectations of the notes and bonds holders do not create cognizable debt because these beliefs do not impose an enforceable duty or liability upon the city. *See Dykes v. N. Va. Transp. Dist. Comm'n,* 242 Va. 357, 411 S.E.2d 1, 10, *cert. denied, Tower v. N. Va. Transp. Dist. Comm'n,* 504 U.S. 941, 112 S.Ct. 2275, 119 L.Ed.2d 201 (1992).

Moreover, the fact the city has designated a "Debt Service Fund" does not turn this situation into one of an unconditional obligation to repay the notes. The money in the Debt Service Fund is from the initial proceeds of the sale of the notes and bonds. It was set aside to pay interest on the notes and bonds from the date of signing until December 2004 (the expected opening of the hotel and conference center). The Debt Service Fund does not include any revenue derived from city taxes. The monies in this fund do not constitute "debt" because the monies are comprised of proceeds from the initial sale rather than monies that must be replenished by taxation. *See St. Charles City–County Library Dist. v. St. Charles Library Bldg. Corp.,* 627 S.W.2d 64, 67 n. 1 (Mo.Ct.App.1981). Unlike the Debt Service Fund, the city's supplemental debt reserve fund does contain tax revenue. However, nothing in the loan agreement states the money in either of these debt reserve funds is set aside for repayment in the event of a nonappropriation. According to the terms of the agreement, the funds are subject to nonappropriation just as all other revenue and funds available for repayment are subject to this condition.

■■■ Finally, property owners' argument that the city is attempting to do indirectly what it may not do directly is similarly unavailing. If the express terms of the city's agreement do not offend the

constitution, then the purpose alone will not render the agreement unconstitutional. *See Lowder,* 711 P.2d at 280.

The notes and bonds clearly indicate the only way the city incurs an obligation to repay the money is an affirmative act authorizing an appropriation in *each* fiscal year. There is no language indicating the city "shall pay" the money back. The city's obligation is restricted to the fiscal year within which the city council appropriates money for repayment. At the end of that fiscal year, the city has no obligation or liability under the loan agreement for the notes and bonds. In other words, the creditors in this case do not have a right to receive and enforce payment. The agreements are designed ·to give future city councils the flexibility to continue repayment, depending upon the city's budgetary needs in any given fiscal year. Such condition of repayment compels our conclusion that the notes and bonds do not constitute constitutional debt.[3] Simply because the city council in any given fiscal year may appropriate money for repayment does not. convert the "debt" into a legal obligation to pay. Because the property owners have failed to meet their burden to prove the notes and bonds constitute constitutional debt and are subject to limitation, we affirm.

## III. Conclusion

We affirm the district court's decision in all respects. The city complied with the requirements of chapter 403 in designating the consolidated area an economic develop-

---

**3.** Our holding is supported by the majority of jurisdictions upholding some form of appropriations-backed debt. *See Lonegan v. State,* 176 N.J. 2, 819 A.2d 395, 404 n. 2 (2003) (citing *Opinion of the Justices,* 335 So.2d 376, 379–80 (Ala.1976); *Carr–Gottstein Props. v. State,* 899 P.2d 136, 143–44 (Alaska 1995); *Dean v. Kuchel,* 35 Cal.2d 444, 218 P.2d 521, 523–24 (1950); *Glennon Heights, Inc. v. Cent. Bank Trust,* 658 P.2d 872, 878–79 (Colo. 1983); *Wilmington Med. Ctr. Inc. v. Bradford,* 382 A.2d 1338, 1346–48 (Del.1978); *State v. Sch. Bd. of Sarasota County,* 561 So.2d 549, 552–53 (Fla.1990); *Sheffield v. State Sch. Bldg. Auth.,* 208 Ga. 575, 68 S.E.2d 590, 594–95 (1952); *In re Anzai,* 85 Hawai'i 1, 936 P.2d 637, 640–43 (1997); *Berger v. Howlett,* 25 Ill.2d 128, 182 N.E.2d 673, 674–75 (1962); *Book v. State Office Bldg. Comm'n,* 238 Ind. 120, 149 N.E.2d 273, 286–89 (1958); *State ex rel. Fatzer v. Armory Bd.,* 174 Kan. 369, 256 P.2d 143, 146–51 (1953); *Wilson v. Ky. Transp. Cabinet,* 884 S.W.2d 641, 645–46 (Ky. 1994); *Edgerly v. Honeywell Info. Sys.,* 377 A.2d 104, 108 (Me.1977); *In re Request for Advisory Opinion Enrolled Senate Bill* 558, 400 Mich. 175, 254 N.W.2d 544, 546–547 (1977); *St. Charles City–County Library Dist. v. St. Charles Library Bldg. Corp.,* 627 S.W.2d 64, 67–69 (Mo.Ct.App.1981); *Ruge v. State,* 201 Neb. 391, 267 N.W.2d 748, 750–52 (1978); *Employers Ins. Co. of Nev. v. State Bd. of Exam'rs,* 117 Nev. 249, 21 P.3d 628, 631–33 (2001); *Schulz v. State,* 84 N.Y.2d 231, 616 N.Y.S.2d 343, 639 N.E.2d 1140, 1148–50, *cert. denied,* 513 U.S. 1127, 115 S.Ct. 936, 130 L.Ed.2d 881 (1995); *Martin v. N.C. Housing Corp.,* 277 N.C. 29, 175 S.E.2d 665, 678–79 (1970); *Haugland v. City of Bismarck,* 429 N.W.2d 449, 454–56 (N.D.1988); *In re Okla. Capitol Improvement Auth.,* 958 P.2d 759, 767–775 (Okla.), *cert. denied, Fent v. Okla. Capitol Improvement Auth.,* 525 U.S. 874, 119 S.Ct. 174, 142 L.Ed.2d 142 (1998); *State ex rel. Kane v. Goldschmidt,* 308 Or. 573, 783 P.2d 988, 993–96 (1990); *Kelley v. Earle,* 325 Pa. 337, 190 A. 140, 144–47 (1937); *Opinion to the Governor,* 112 R.I. 139, 308 A.2d 802, 807 (1973); *Caddell v. Lexington County Sch. Dist. No. 1,* 296 S.C. 397, 373 S.E.2d 598, 599–600 (1988); *McFarland v. Barron,* 83 S.D. 639, 164 N.W.2d 607, 609–11 (1969); *Ragsdale v. City of Memphis,* 70 S.W.3d 56, 63–70 (Tenn.Ct.App.2001); *Tex. Pub. Bldg. Auth. v. Mattox,* 686 S.W.2d 924, 928 (Tex. 1985); *Mun. Bldg. Auth. of Iron County v. Lowder,* 711 P.2d 273, 277–81 (Utah 1985); *Dykes v. N. Va. Transp. Dist. Comm'n,* 242 Va. 357, 411 S.E.2d 1, 8–10(Va.), *cert. denied, Tower v. N. Va. Transp. Dist. Comm'n,* 504 U.S. 941, 112 S.Ct. 2275, 119 L.Ed.2d 201 (1992); *Dep't of Ecology v. State Fin. Comm.,* 116 Wash.2d 246, 804 P.2d 1241, 1245–46 (1991); *Dieck v. Unified Sch. Dist. of Antigo,* 165 Wis.2d 458, 477 N.W.2d 613, 617–21 (1991)).

ment area to support the urban renewal plan. The bonds and notes issued by the city to fund the project do not constitute constitutional debt because repayment is expressly conditioned upon the city council's appropriation of funds for repayment in each fiscal year. The loan agreements clearly state the city's obligation under the loan terminates and becomes null and void on the last day of a fiscal year in which the necessary funds were appropriated.

AFFIRMED.